ADMIRAL REALTY COMPANY, Appellant, *v.* THE CITY OF NEW YORK et al., Respondents.

JOHN R. RYON, Appellant, *v.* WILLIAM R. WILLCOX et al., Constituting the Public Service Commission for the First District of the State of New York, et al., Respondents.

JOHN J. HOPPER, Appellant, *v.* WILLIAM R. WILLCOX et al., Constituting the Public Service Commission for the First District of the State of New York, Respondents.

Constitutional law — rule for construction of statutes — when municipal authorities are empowered by statute to perform certain acts and enter into contracts therefor, the courts will not condemn such contracts because they do not approve all the details thereof — New York (city of) — contracts between city of New York and Interborough Rapid Transit Company and the Brooklyn Union Elevated Railroad Company for the construction, extension and operation of certain subways and railroads do not violate article 8, section 10, of the State Constitution — the Rapid Transit Act not violative of article 3, section 18, of the State Constitution, forbidding private or local bills for benefit of any corporation.

1. If possible within fixed principles of law our courts will uphold as constitutional rather than condemn legislation and proposed action of state and municipal authorities thereunder.

2. Where a municipality and the officials acting in its behalf have the power to make contracts, in the absence of fraud or waste, the question whether it is wise to do so and whether their terms are advantageous for the municipality and public are solely for the consideration and decision of those officials. If, however, a municipality or its representatives propose to do that which is prohibited, they must be restrained, no matter what the particular form of procedure may be.

3. The proposed contracts between the city of New York and the Interborough Rapid Transit Company and the Brooklyn Union Elevated Railroad Company do not violate section 10 of article 8 of the Constitution which prohibits any city from giving any money or property or loaning its money or credit to or in aid of any individual, association or corporation.

4. The construction of railroads by a municipality is a city purpose within the meaning of the Constitution, and such construction may be made at municipal expense. The municipality need not itself operate such railroads, but may provide for the operation thereof by some one else under a lease not in perpetuity. Hence the city may construct and lease new subways to the Interborough Company.

5. If a city construct subways it has the right to make a contract for their building and equipment, and provide for repayment to one who furnishes construction or contributes money. This is what it is proposed to do by one of the so-called preferential payments provided for by the contracts with the Interborough Company. The company is to advance a large sum of money for the building and equipment of subways, and the city proposes that it shall secure payment from earnings of the roads. Such repayment is none the less legal because it is to be gradually made from the earnings of the property constructed rather than directly from the treasury or from the proceeds of tax levies or bond sales.

6. The state and municipal authorities in the exercise of the judgment and discretion confided to them may say that, while the subways to be constructed under the proposed contract would to some extent relieve the transportation situation, they would not by themselves furnish such a complete system subject to a single five-cent fare as should be afforded to the inhabitants of a great city, and that in order to accomplish this and subserve the general public welfare the new subways should be operated with the existing ones as an entire and connected system and subject to a single fare of five cents.

7. A municipality having made a contract may subsequently bargain under full legislative authority for a modification of that con-

tract so that it will be adjustable to altered, and then existing, circumstances, paying an adequate consideration either for what the other party gives up or for what it secures under the modifications.

8. The city owns the subways already constructed and which it desires to have operated in connection with the ones to be constructed. It has, however, made a lease of these old subways extending, under possible extensions, for many years and containing no provisions reserving to tho municipality the right to insist upon extensions or that they shall be operated in connection with the new ones for a single fare. In order to get rid of these limitations upon the enjoyment of its own property it proposes for a consideration to secure from one of these defendants modifications of the present lease of the old subways, by a reduction of the term for which the lessee may operate the subways, a consent that the city may exchange such sections of the new subway line on one side of Manhattan for such sections of the old line upon the other side as will enable it to secure a complete line on one side, the right to retake the entire subway system at the expiration of a shorter period than is provided for the termination of the lease, and the operation of old and new subways as one system subject to a single five-cent fare. In consideration for these modifications the city agrees that the Interborough Company shall receive preferential payments, namely, from the earnings of the entire system an amount, annually, equivalent to earnings on its present system from which, however, it must pay various charges. *Held*, that the payment from the earnings of the united subways each year to such defendant company of an amount equal to its present yearly earnings is not obnoxious to the Constitution.

9. The Interborough contract provides that there shall be retained for the benefit of the operator from the earnings of the entire system a sum for operating expenses, and that after deduction of all of the sums which have been discussed and certain others for the benefit of the city and which are not criticised, the balance of earnings shall be equally divided between the city and that company. *Held*, that these provisions are entirely legal.

10. There is nowhere in the contract with the Interborough Company any partnership or joint operation of municipal and privately-owned property with illegal benefactions to the private owner as resultants.

11. The power to build and own railroads, because effecting a proper municipal purpose, includes the lesser power to perfect an incomplete municipal system by leasing for a limited term a privately-owned system to be operated in connection with it. The

general rule is that a municipality may acquire property for proper purposes by lease as well as purchase. The power thus to lease outright a privately-owned road also includes the lesser and fairly incidental power on the part of the municipality to make a traffic or transportation contract with the owner of a private road whereby the latter will be operated in connection with the former's road under such system of transfers between and fares over the two systems as the municipal representatives deem for the best interests of the public. Furthermore, if the municipality has a right to contract with the lessee of its roads that such lessee shall subject its own system to a single fare, it has a right to bargain for proper compensation to be given for the privilege thus secured and for the rental which it is to receive for its own property when operated under conditions of a single fare. This justifies the provision for a preferential payment such as is contained in the contract with the Brooklyn company.

12. Under the Brooklyn contract the city constructs and leases its subways to the company for a consideration or rental to be paid from the net earnings and it affords to its lessee an opportunity to derive profit from the lease by receipt of a like share of such earnings. There is no gift or loan in this, but an ordinary contract for a consideration just as valid in the case of a municipality as in the case of an individual. It exacts from the lessee that it shall expend large sums for bettering its system and that it shall operate such system in connection with or in subordination to the municipal road under a reduced fare, and for these rights, in the interest of the public, over the private road, it pays a consideration. Under this contract there is neither a partnership with the city nor a gift or loan by it.

13. The Rapid Transit Act does not violate that section of the Constitution which provides: "The legislature shall not pass a private or local bill in any of the following cases:  *  *  *  Granting to any corporation, association or individual the right to lay down railroad tracks.  *  *  *  The legislature shall pass general laws providing for the cases enumerated in this section, and for all other cases which, in its judgment, may be provided for by general laws." (Art. 3, § 18.)

14. The Rapid Transit Act does not require that there should be a referendum before execution of the contracts in question.

*Admiral Realty Co.* v. *City of New York,* 151 App. Div. 888, affirmed.

(Argued June 11, 1912, decided June 29, 1912.)

APPEAL in each of the above-entitled actions from a judgment of the Appellate Division of the Supreme Court

in the second judicial department, entered May 20, 1912, which affirmed a judgment in favor of defendants entered upon a decision of the court at Special Term sustaining demurrers to and directing a dismissal of the complaint.

The actions are brought by taxpayers to restrain the execution by the city of New York, its officials, and the members of the public service commission for the first district, of two contracts, one with the defendant Interborough Rapid Transit Company and the other with the Brooklyn Union Elevated Railroad Company or whatever company may take its place, for the construction, equipment and operation of subway and elevated railroads principally to be located in the boroughs of Manhattan and Brooklyn. The important attack on the contracts is based upon the claim that they and the Rapid Transit Act under which they are to be executed violate the provision of the Constitution against the gift by a city of any money or property or loan by it of money or credit to or in aid of any individual, association or corporation.

It is impossible within reasonable limits to state even the substance of these contracts. Their more important provisions which are involved in the discussion of this appeal may be briefly summarized as follows:

The proposed contract with the Interborough Company covers, first, the construction and equipment, and, second, the operation by the Interborough Company of new subways in connection with existing ones. It provides for the construction at an estimated expense of $112,000,000 and for the equipment at the expense of about $21,000,000 of many miles of new subway, which at some points changes into elevated construction, both on the east and west side of Manhattan island and with branches extending across the East river. The lines of new construction, generally speaking, in connection with the present subways will form two complete lines north and south through Manhattan borough, one on the easterly and the other on the westerly side, each terminating in the Bronx

at one end and in Brooklyn at the other, with a lateral line to Queens county and feed extensions reaching into the outlying districts of the Bronx, Queens and Brooklyn boroughs. The Interborough Company is to contribute to the cost of construction $56,000,000 and for equipment $21,000,000. The title or ownership of the subways will always be in the city, and it is contemplated that at the expiration of forty-nine years, for which they may be operated by the lessee, the latter will have received repayment of sums furnished for construction through the operation of a sinking fund hereinafter referred to. At such expiration the city is to pay for any equipment furnished by the company and taken over by it.

There is a provision for recaption by the city of the subways to be constructed from the lease above mentioned at any time after the expiration of ten years from the date of commencement of operation, and in case the city thus recaptures the subways and takes their equipment furnished by the operating company before expiration of the lease, it is to repay to the company the sums expended by it for construction and equipment with an added per cent which diminishes each year.

There are also various provisions for the construction and equipment of extensions from time to time, but it is unnecessary to go into the details of those as they are not claimed to substantially modify for the purposes of this appeal the other facts which have been or will be referred to.

A lease is to be made to the Interborough Company of the new subways for the term of forty-nine years subject to the right of recapture hereinbefore provided for. This contemplates within certain limits the operation of the new and present subways now leased to the Interborough Company as a single system. To that end it is provided that the entire system shall be subject to a single five-cent fare, also that the Interborough Company shall level its present leases of subways so that the present terms

thereof and the extensions to which it is entitled will expire at the same time with the lease of the new subways; also that it will agree to what has been called an "exchange of legs," so that in case the city desires to recaptures the system to be constructed it may make such an exchange of new construction on one side of the island with old construction on the other as will enable it to secure a through line on one side from north to south.

Rental or payment to the city by the Interborough Company for the operation and enjoyment of the subways is provided for in the following manner:

The receipts of the new and old subways are to be pooled and therefrom is to be deducted for the benefit of and paid to the company:

(1) Operating expenses of the entire system.

(2) A yearly sum to represent the average annual income from operation of the existing subway lines and equipment for the two fiscal years ending June 30, 1911, which is $6,335,000, and out of which sum said Interborough Company is to pay its fixed charges such as interest and sinking fund payments on its capital investment in the present subway lines and equipment.

(3) An annual sum equal to six per cent per annum upon the investment of the Interborough Company in the proposed subway lines and equipment amounting to $77,000,000. Out of said sum said company is to pay all charges for interest as the same becomes due and provide a sinking fund sufficient to retire and pay off at maturity the principal of its original investment in said subway construction and equipment. This provision also will provide for repayment of such sums as may be expended by the company for betterments or improvements either to the subways or equipment thereof during the term of the lease by details which it is not necessary to state.

(4) After the payment of the foregoing sums there shall be deducted interest and sinking fund upon the

capital provided by the city for the construction of the new lines and such further sum as will bring the payments to be made to the city during the entire period of the forty-nine year lease up to an amount equal to $8\frac{76}{100}$ per cent upon its capital investment in the original construction in the new subways.

(5) The remainder of said proceeds of said earnings shall annually be divided between the city and the company equally.   The charges upon the receipts in favor both of the company and the city in the order stated are cumulative in case there should be a deficiency of earnings in any year.

Said contract also is to provide for the construction by the Interborough Company of a large amount of elevated roads in connection with the property of the Manhattan Elevated Railroad now operated by it and which will touch the subway system at various points.   While the city reserves the right to recapture this new construction, it is stated in behalf of the Interborough Company, without contradiction by the appellants, that under the proposed contract this construction is to be entirely paid for by the Interborough Company and erected under franchises granted by the city, and that, therefore, it does not become a feature of any importance in the consideration of the questions now being addressed to us.

The contract to be made with the Brooklyn Union Elevated Railroad Company, or such companies as it may control or as may take its place, contemplates and is to provide for the construction of a large amount of subway railroad in the city of Brooklyn and adjacent territory, costing in the neighborhood of $100,000,000, to be paid for by and belong to the city of New York; the expenditure by the said Brooklyn Company or companies of about $26,000,000 in extending and bettering the railroad system now and thereafter to be owned by it or them, and the expenditure by it or them of about $24,000,000 in equipping said new lines.   Provisions are

to be made for the recaption by the city of said subway lines from the lease which is to be made and is hereafter referred to, and for the acquisition by it of the equipment and of the extensions and improvements of the Brooklyn Company's system which do not appear, and, so far as I can discover, are not claimed by the appellants to be materially different in principle from those in the case of the Interborough Company already referred to except that the acquisition by the city of the extensions and improvements of the Brooklyn Company's system, either by recaption or at the end of the term of the proposed lease, must necessarily be somewhat controlled and modified by the physical relation and connection of such extensions and improvements to a system which will belong to a private corporation.

Provisions are also to be made for extensions and improvements both of lines and equipment during the continuance of the lease, which, as in the case of the Interborough Company, do not appear to present for our consideration any legal questions in addition to those which arise in connection with the main provisions of the proposed contract.

A lease is to be made by the city with the Brooklyn Company under which it will operate for the term of forty-nine years the lines to be constructed and owned by the city and equipped as aforesaid in connection with its own system to be extended, improved and equipped as aforesaid as a single system and subject to a single five-cent fare.

The earnings of the two systems thus operated together are to be pooled and divided in the following way for the following purposes:

(1) Payment to the Brooklyn Company of the cost of operation of the entire system.

(2) Payment to the Brooklyn Company annually of a sum equivalent to the net earnings from the operation of the lines now operated by the Brooklyn Union Elevated

Railroad Company, calculated as in the agreement provided and not to exceed $3,500,000 per year, out of which it must make certain payments for interest and otherwise.

(3) Payment to the Brooklyn Company of the actual annual charges for carrying the cost of all equipment acquired after the date of the contract with provisions for a sinking fund thereon and for carrying any portion of the cost of construction not met from the funds of the city, including in said cost of construction the cost of additions to and extensions of the property of the Brooklyn Elevated Railroad Company and of the Sea Beach Railroad Company after the date of the contract with provisions for sinking fund thereon.

(4) Payment to the city of interest on bonds issued by it to defray cost of construction, etc., with provision for a sinking fund and which provision is to be cumulative in favor of the city.

(5) Division after the foregoing deductions and payments of the net earnings, if any, between the city and the operator or lessee.

*Louis Marshall, Daniel P. Hays, Ralph Wolf* and *Samuel Untermyer* for Admiral Realty Company, appellant. The proposed contracts for the operation of the subways about to be constructed by the city of New York and the provisions of chapter 226 of the Laws of 1912, intended to authorize their execution, violate section 10 of article 8 of the New York Constitution. (*Stuart* v. *Palmer*, 74 N. Y. 183; *Gilman* v. *Tucker*, 128 N. Y. 190; *Colon* v. *Lisk*, 153 N. Y. 194; *Fisher Co.* v. *Woods*, 187 N. Y. 90; *Mount Sinai Hospital* v. *Hyman*, 92 App. Div. 280; *Pollock* v. *F. L. & T. Co.*, 157 U. S. 580; *Doe* v. *Lakeman*, 2 B. & Ad. 30; *Johnson* v. *Arnold*, 1 Ves. Sr. 171; *Paterson* v. *Ellis*, 11 Wend. 259; *Jennings* v. *Conboy*, 73 N. Y. 230.) The provisions of the Rapid Transit Act (L. 1909, ch. 498;

L. 1912, ch. 226), so far as they authorize the public serv-. ice commission for the first district to grant franchises to railroad companies to lay down tracks, are in. violation of article 3, section 18, of the Constitution. (*Sun Pub- lishing Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *State ex rel. City of Columbus* v. *Mitchell*, 31 Ohio St. 592; *State ex rel. Attorney-General* v. *Anderson*, 44 Ohio St. 247; *Stack* v. *City of Brooklyn*, 150 N. Y. 335; *Matter of Henneberger*, 155 N. Y. 420.)

*Willard N. Baylis* for John R. Ryon, appellant. The proposed contract is in violation of section 10 of article 8 of the Constitution of the state of New York, which for- bids a city to loan its money or credit to or in aid of any corporation, or to incur any indebtedness except for city purposes. (*Wyscaver* v. *Atkinson*, 37 Ohio St. 80; *Coun- terman* v. *Dublin Township*, 38 Ohio St. 515; *Pleasant Township* v. *Ætna L. Ins. Co.*, 138 U. S. 67; *Alter* v. *City of Cincinnati*, 56 Ohio St. 47.) The proposed con- tract is also in violation of section 18 of article 3 of the Constitution, which prohibits the legislature from pass- ing a private or local bill granting to any corporation a right to lay down railroad tracks. (*Sun Publishing Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Matter of Henneberger*, 155 N. Y. 420.)

*Clarence J. Shearn* for John J. Hopper, appellant. The proposed contracts, and the legislation that purports to authorize them, are in violation of section 10, article 8, of the New York State Constitution. (*Sun Publishing Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Pleasant Township* .v. *Ætna L. Ins. Co.*, 138 U. S. 67; *Alter* v. *City of Cincinnati*, 56 Ohio St. 47; *Walker* v. *City of Cincin- nati*, 21 Ohio St. 15; *Taylor* v. *Ross County*, 23 Ohio St. 22; *Scott* v. *La Porte*, 162 Ind. 34; *Wyscaver* v. *Atkinson*, 37 Ohio St. 97; *Counterman* v. *Dublin*, 38 Ohio St. 515.) The contracts are illegal because, if for extensions of the present subway, they provide for con-

struction by the city and private corporations at their joint expense instead of by the city and at the public expense, and, if for new subways, because there has been no referendum authorizing their construction at public expense. (L. 1894, ch. 752, § 12; *Sun Publishing Assn.* v. *Mayor, etc.,* 152 N. Y. 257.)

*Archibald R. Watson, Corporation Counsel* (*Lewis H. Hahlo* of counsel), for city of New York, respondent. The purpose and intent of the People in adopting section 10 of article 8 of the Constitution should control. Contracts sanctioned by legislative authority such as are the subjects of attack in these actions were not in contemplation; it, therefore, could not have been the intent to interdict them. (Cooley on Const. Lim. [7th ed.] 89; Endlich on Interp. of Statutes, 712, § 507; Story on Const. [5th ed.] 305, § 400; *Rathbone* v. *Wirth,* 150 N. Y. 459; *People ex rel. Bolton* v. *Albertson,* 55 N. Y. 50; *People* v. *Fancher,* 50 N. Y. 228; *S. P. & P. Assn.* v. *Mayor, etc.,* 152 N. Y. 257.) Neither the legislative act nor the contracts conflicts either with the letter or the spirit of section 10 of article 8 of the Constitution. (*People ex rel. Schwab* v. *Grant,* 126 N. Y. 473.) The constitutionality of the so-called preferential payments is sustainable as considerations for property purchased from the companies and as compensation to the companies for their services in operating the municipally-owned lines in furtherance of "a city purpose." (*People ex rel. Murphy* v. *Kelly,* 76 N. Y. 475; *Tocci* v. *Mayor, etc.,* 73 Hun, 46; *Brooks Co.* v. *City of Philadelphia,* 162 Penn. St. 123; *Brode* v. *City of Philadelphia,* 230 Penn. St. 434; *City of Cincinnati* v. *Dexter,* 55 Ohio St. 93; *Taylor* v. *Ross Co.,* 23 Ohio St. 76.) The Rapid Transit Act (L. 1891, ch. 4, as amd.) is a general, not a local, law within the purview of section 18, article 3 of the Constitution. (*Matter of Henneberger,* 155 N. Y. 420; *People* v. *Dunn,* 157 N. Y. 528; *Kittinger* v. *B. T. Co.,* 160 N. Y. 377;

*St. John* v. *Andrews Inst.*, 191 N. Y. 254; *Matter of Ahearn* v. *Elder*, 195 N. Y. 493.)

*George S. Coleman, Oliver C. Semple* and *Le Roy T. Harkness* for Public Service Commission, respondent. The proposed contracts cannot be successfully attacked on the ground that they involve a loan of city money or credit to corporations in violation of the provisions of section 10 of article 8 of the Constitution of the state of New York. (*Sun P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Talcott* v. *City of Buffalo*, 125 N. Y. 280; *Matter of R. T. R. R. Comrs.*, 197 N. Y. 81; *People* v. *Brooklyn Cooperage Co.*, 187 N. Y. 142; *Fox* v. *M. & H. R. H. Society*, 165 N. Y. 517.) The Rapid Transit Act is not a private or local act within the meaning of article 3, section 18, of the Constitution. (*Matter of N. Y. E. R. R. Co.*, 70 N. Y. 327; *People ex rel. N. Y. E. L. Co.* v. *Squire*, 107 N. Y. 593; *Matter of Church*, 92 N. Y. 1; *Ferguson* v. *Ross*, 126 N. Y. 459; *Matter of Dobson*, 146 N. Y. 359; *Matter of Henneberger*, 155 N. Y. 420; *People* v. *Dunn*, 157 N. Y. 528; *Kittinger* v. *B. T. Co.*, 160 N. Y. 377; *St. John* v. *Andrews Institute*, 191 N. Y. 254.)

*Richard Reid Rogers* and *Alfred E. Mudge* for Interborough Rapid Transit Company, respondent. The proposed agreement with the Interborough Rapid Transit Company does not violate article 8 of section 10 of the Constitution. (*Sun P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Tocci* v. *Mayor, etc.*, 73 Hun, 46; *Brook Co.* v. *City of Philadelphia*, 162 Penn. St. 123; *Murphy* v. *Kelly*, 76 N. Y. 475; *Trustees, etc.*, v. *Roome*, 93 N. Y. 313; *People ex rel. Bd. of Charity* v. *N. Y. Society*, 161 N. Y. 223; *Fox* v. *M. & H. R. H. Society*, 165 N. Y. 517; *Walker* v. *City of Cincinnati*, 21 Ohio St. 14; *Taylor* v. *Commissioners*, 23 Ohio St. 22; *Wyscaver* v. *Atkinson*, 37 Ohio St. 80; *Counterman* v. *Dublin Township*, 38 Ohio St. 515.) The Rapid Transit Act does not violate

article 3, section 18, of the Constitution. (*Sun P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327; *Matter of Gilbert El. Ry. Co.* 70 N. Y. 361; *Matter of Church*, 92 N. Y. 1; *People ex rel. N. Y. E. L. Co.* v. *Squire*, 107 N. Y. 593; *Ferguson* v. *Ross*, 126 N. Y. 459; *Matter of Henneberger*, 155 N. Y. 420; *People* v. *Dunn*, 157 N. Y. 528; *Kittinger* v. *Buffalo Traction Co.*, 160 N. Y. 377; *St. John* v. *Andrews Inst.*, 191 N. Y. 254.)

*Charles A. Collin* and *George D. Yeomans* for Brooklyn Rapid Transit Company et al., respondents. Neither the purpose nor the effect of the "preferential payments" from the "pooled earnings," or of the division of profits after deduction of all "preferential payments" from the "pooled earnings," as provided in the contemplated lease to the Brooklyn Company, can possibly be a gift of money or property or a loan of money or credit of the city to the Brooklyn Company. (*Sun P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 251.) The proposed lease to the Brooklyn Company does not effect such a *quasi* partnership, or joint enterprise, between the city and the Brooklyn Company as can possibly work out the result of a gift or loan of property, money or credit of the city to the company in violation of article 8, section 10, of our State Constitution. (*Walker* v. *City of Cincinnati*, 21 Ohio St. 14; *Sun P. & P. Assn.* v. *Mayor, etc.*, 152 N. Y. 257; *Brode* v. *City of Philadelphia*, 230 Penn. St. 434; *Brown* v. *Turner*, 176 Mass. 113; *Holder* v. *City of Yonkers*, 39 App. Div. 3.) The limitation of the Rapid Transit Act to cities having over one million inhabitants does not make that act special or local within the meaning of the constitutional prohibition of special or local legislation. (*Sun Pub. Assn.* v. *Mayor, etc.*, 8 App. Div. 230; 152 N. Y. 257; *Matter of Henneberger*, 155 N. Y. 420; 25 App. Div. 164; *People* v. *Dunn*, 157 N. Y. 528; *Kittinger* v. *B. T. Co.*, 160 N. Y. 377; *St. John* v. *Andrews Inst.*, 191 N. Y.

254; 214 U. S. 20; *Matter of N. Y. El. R. R. Co.*, 70 N. Y. 327; *Matter of Church*, 92 N. Y. 1; *People* v. *Squire*, 107 N. Y. 593; *Ferguson* v. *Ross*, 126 N. Y. 459.)

HISCOCK, J.   These are taxpayers' actions brought to restrain the execution in behalf of the city of New York by its officials and the members of the public service commission for the first district of two contracts, one with the defendant Interborough Rapid Transit Company and the other with the Brooklyn Union Elevated Railroad Company, or whatever company may take its place, for the construction, equipment and operation of subway and elevated railroads principally to be located in the boroughs of Manhattan and Brooklyn.   The complaints do not charge fraud, collusion or actual misconduct in the proposed execution of said contracts, but they attack the latter as fundamentally illegal because violating the provision of the Constitution which declares that "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, * * * nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes."   (Art. 8, section 10.)

As we shall see hereafter, the only hope for success in this attack must be drawn from the first clause of the provision prohibiting a gift or loan of money, property or credit.

It is proposed to execute the contracts under and in accordance with authority conferred by the legislature under the so-called Rapid Transit Act (Laws of 1891, chapter 4), and its various amendments.   Originally it was urged that this act was not broad enough to authorize the contracts, but since the commencnment of the actions amendments have been made which concededly meet and destroy this claim, and, therefore, the real question is whether the statute attempts to permit something

which is in violation of the Constitution and, therefore, is itself unconstitutional.

The cases were discussed at Special Term by Mr. Justice Blackmar in an elaborate and carefully considered opinion.

It is to be be borne in mind at the outset and at every point of our discussion that this court has nothing whatever to do with the wisdom of the proposed contracts. If the municipality and the various officials acting in its behalf have the power to make them then the questions whether it is wise to do so and whether their terms are advantageous for the municipality and public are solely for the consideration and decision of those officials. After all the criticisim and discussion which have been directed at the present transit situation in New York it is only just and reasonable to assume that public officials charged with the duty of bettering that situation have entered on their task with care, all the wisdom and foresight at their command, and with complete devotion to the public welfare. But even if we should doubt whether they have reached the best possible solution of a great and perplexing problem, our sole and only duty still would be simply to determine whether the Constitution permits the legislation and contracts in question and there again it is to be remembered that our duty is to be so discharged if possible within fixed principles of law as to uphold rather than condemn the legislation and the proposed action of the various state and municipal authorities thereunder.

As stated, the proposed contracts are two in number, and entirely distinct. It is impossible within reasonable limits to state their provisions even with approximate completeness. In the prefixed statement of facts I have attempted only briefly to summarize those more important provisions which are necessarily involved in a discussion of this appeal, and which have been called to our attention by the various counsel. Here I shall only outline their general character.

The contract with the Interborough Company provides for the construction and equipment of many miles of municipal subways and elevated road mainly in the borough of Manhattan, at municipal and Interborough's expense; joint operation for forty-nine years or a shorter period of the same and also of municipal subways now leased to the Interborough as a single system subject to a single five-cent fare; preferential payment to the Interborough Company from earnings of the entire system of (1) operating expenses; (2) principal and interest of money to be expended by the company for construction and equipment; (3) an annual sum equal to earnings of the present subways; (4) a preferential payment to the city on account of its investment; (5) division of the remainder equally between city and company.

The contract with the Brooklyn Company provides for the construction and equipment of many miles of municipal subway mainly in the borough of Brooklyn at municipal expense; the extension and betterment of the system of railroads owned by the Brooklyn Company and the expenditure by the latter for that purpose and for equipment of $50,000,000; operation of the subways under a lease for forty-nine years or a shorter period by the Brooklyn Company in conjunction with its own railroad as a single system subject to a single five-cent fare; preferential payments to the city and company from earnings of a similar general nature to those in the case of the other contract, and division of the balance of earnings between city and company.

In attacking these contracts much is said about a joint ownership of property, about the speculative partnership between the municipality and the railroad company and about the obnoxious pooling of the proceeds derived from the joint operation of municipal and privately owned property. While these arguments indirectly are entirely pertinent and legitimate, we must not allow them to obscure the exact and only question presented to us in

this connection.   We are not considering a constitutional provision in terms forbidding the joint operation of municipal and privately owned property, but one which condemns and prohibits any gift or loan by a municipality of money, property or credit to or in aid of a corporation such as these railroads, and, therefore, we must always keep our minds fixed on this precise evil as the test of the validity of the proposed contracts.   If through and by them the municipality or its representatives propose to do that which is prohibited their execution must be restrained, no matter what the particular form of procedure may be. If, on the other hand, directly and indirectly the contracts are free from this vice then they are not to be condemned under this provision of the Constitution.

The provisions which are especially pointed at by the appellants as obnoxious to the Constitution and as infecting the entire contracts with illegality are those providing for the so-called preferential payments to the operating companies from the joint earnings of the new subways and the roads to be operated with them respectively before the city secures any returns.   If those payments do not result in gifts or gratuities by the municipality to the operating companies, then it is safe to say that none are to be found within the provisions of the contracts.   It seems to me that on a perfectly fair and just analysis of the contracts they do not effect this result, but are or will be incidents of contracts which the municipality under the authority of the legislature may lawfully make, and I shall proceed as briefly as possible with that analysis, taking up first the contract with the Interborough Company.

Even if it had not been stated again and again without contradiction on the argument of this appeal, we might probably take judicial notice of the fact that the rapid transit facilities in the cities of New York and Brooklyn have been for a long time inadequate and unsatisfactory. Desiring to remedy this situation and meet the demands

of the public, the proper officials acting in behalf of the municipality of New York advertised for bids for the construction of new subways, first, with private capital, and, second, by certain sections at municipal expense. No bids were received in answer to the first proposition. Various bids were received in answer to the second proposition but none of them were satisfactory. As the result of them, however, negotiations were had between the public service commission and municipal officials and the Interborough and other railroad companies which resulted in the present proposed contract whereby mainly in the borough of Manhattan many miles of new subway are to be constructed which will be owned by the city and towards the construction and equipment respectively of which the Interborough is to contribute sums of about fifty millions of dollars and twenty-seven millions of dollars and undertake the operation of the subways.

The validity of these provisions of the contract to this point, at least standing by themselves, is established beyond any possibility of debate by the case of *Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.* (152 N. Y. 257). This court there decided, absolutely and conclusively, Judge HAIGHT writing the opinion, that the construction of railroads, in that case as in this subways, by a municipality was a city purpose within the meaning of that provision of the Constitution which has been quoted, and that such construction might be made at municipal expense. It further decided that the municipality need not itself operate such railroads, but might provide for the operation thereof by some one else under a lease not in perpetuity. Therefore, we start with the incontestable proposition that the city may construct and lease new subways to the Interborough Company.

But, of course, if a city may construct subways it must have the right to make a contract for their building and equipment and provide for repayment to one who furnishes construction or contributes money. This is what

it is proposed to do by one of the so-called preferential payments which are attacked. The Interborough Company is to advance $77,000,000 for the building and equipment of subways and the city proposes that it shall secure repayment from earnings of the roads. Certainly such repayment is none the less legal because it is to be gradually made from the earnings of the property constructed rather than directly from the treasury or from the proceeds of tax levies or bond sales. It is to be noted that there is no provision that the city shall loan its credit by guaranteeing payment of the bonds by which it is assumed the Interborough Company will raise the money which it is to expend.

Then going a step further with the contract, it appears, at least the state and municipal authorities in the exercise of the judgment and discretion confided to them may say, that while the subways to be constructed under the proposed contract would to some extent relieve the transportation situation, they would not by themselves furnish such a complete system subject to a single five-cent fare as should be afforded to the inhabitants of a great city; that in order to accomplish this and subserve the general public welfare the new subways should be operated with the old ones as an entire and connected system and subject to a single fare for five cents. Have the municipal and other authorities under the legislative sanction the right to effect this purpose in the method proposed in other provisions of the contract?

The city owns the subways already constructed and which it desires to have operated in connection with the ones to be constructed. If it held them entirely free it could make a lease of old and new subways as a single system as it desires to. It has, however, made a lease of these old subways extending under possible extensions for many years and containing no provisions reserving to the municipality the right to insist upon extensions or that they shall be operated in connection with the new

9

ones for a single fare.   In order to get rid of these limitations upon the enjoyment of its own property it proposes for a consideration to secure from the Interborough Company modifications of the present lease of the old subways.   These modifications as already stated in the summary of the contracts are a reduction of the term for which the lessee may operate the subways, a consent that the city may exchange such sections of the new subway line on one side of Manhattan for sections of the old line upon the other side as will enable it to secure a complete line on one side, the right to retake the entire subway system at the expiration of a shorter period than is provided for the termination of the lease, and the operation of old and new subways as one system subject to a single five-cent fare.   In consideration for these modifications the city agrees that the Interborough Company shall receive another of the preferential payments which has been attacked, namely, from the earnings of the entire system an amount, annually, equivalent to earnings on its present system from which, however, it must pay various charges.

The question whether the city may make this arrangement with the Interborough Company seems to resolve itself into the fundamental inquiry whether a municipality having made a contract may subsequently bargain under full legislative authority for a modification of that contract so that it will be adjustable to altered and then existing circumstances, paying an adequate consideration either for what the other party gives up or for what it secures under the modifications.   It seems to me obvious that a municipality has such power.   It is an ordinary incident to the power to make a contract that one who has made such a contract which through inadvertent provisions or change in conditions becomes undesirable may bargain for a modification or cancellation thereof.   The power to make a contract begets the right to procure its amendment or rescission.   I can see no reason why this

principle applicable to an individual should not be applied to a municipality in such a case as the present one and why we should not hold even without guiding authority that a municipality which had the power to make a contract for the operation of subways may secure modifications thereof when it has become inadequate to meet existing conditions.

In addition to mere reasoning there are authorities which affirm this power, to some of which reference will be made.

*Tocci* v. *Mayor, etc., of N. Y.* (73 Hun, 46) was a taxpayer's action to restrain the city of New York from contributing under legislative authority towards the expenses to be incurred in removal of the tracks of certain railroad companies from various streets in the city of New York so as to permit a fuller enjoyment of the latter by the public. I am unable to see any difference between the principle involved in that case and the one immediately under discussion. By appropriate methods which amounted to a contract the railroads had secured the right to operate their tracks in the streets in question. This arrangement had become inconsistent with the best interests of the city. Nevertheless, it could not be terminated by compulsion. Under these circumstances the suit was dismissed and it was determined that the city by bargain and for a consideration might secure a modification of the rights to which the railroads were entitled under their then existing contracts or franchises.

The case of *Brooke* v. *City of Philadelphia* (162 Penn. St. 123) involved similar questions and principles. There it was held that the city might incur expense in constructing a subway for a railroad company in order to eliminate grade crossings without violation of constitutional provisions quite as broad as here on the subject of gifts by a municipality. (See, also, *People ex rel. Murphy* v. *Kelly,* 76 N. Y. 475.)

Of course, if this reasoning is correct, the payment from

the earnings of the united subways each year to the Interborough Company of an amount equal to its present yearly earnings is not obnoxious to the Constitution. For if it be once decided that the municipality has the right to bargain with the Interborough Company for a modification of the latter's lease of the old subways so as to bring them into a unified system of transportation with the new ones, the consideration to be paid for such modification, in the absence of fraud or collusion which is not charged, rests in the discretion and judgment of the public officials, and certainly as observed before, it is not objectionable that instead of burdening the municipality with more rapid and oppressive methods of payment it is provided that this consideration shall be paid from year to year out of the earnings of the railroads.

The only remaining provisions which I shall specifically consider are those that there shall be retained for the benefit of the operator from the earnings of the entire system a sum for operating expenses, and that after deduction of all of the sums which have been discussed and certain others for the benefit of the city and which are not criticised, the balance of earnings shall be equally divided between the city and the Interborough Company. If I have been right in my reasoning thus far it follows that these provisions are entirely legal. An owner leasing property may take his compensation or rent in stated sums or by a certain proportion of the net proceeds of the property after deducting legal and specified charges against those proceeds. There is no difference in legal principle. The owner does not become a partner with the tenant because he adopts the latter method instead of the first. The time-honored practice of leasing a farm on shares instead of for a fixed annual rental has never been supposed or held to transform a lease into articles of copartnership.

In short, if I have viewed the contract from the proper standpoint, there is nowhere any partnership or joint

operation of municipal and privately owned property such as is claimed by appellants with illegal benefactions to the private owner as resultants. The city will own all the subways which are to be operated together. It is true that at present the Interborough Company has a separate interest in some of them as lessee. But by the proposed contract this lease is to be modified and superseded by a new agreement whereby the city becomes re-invested with a substantial control thereof and re-lets them in connection with its new subways under one contract for operation as a single and entire system. But if this view is incorrect, and the Interborough contract is to be regarded as contemplating the joint operation of lines owned by the municipality and of lines possessed under a separate estate by the lessee, the arrangement would not be unconstitutional, as I shall attempt to show in the case of the Brooklyn contract where the facts do present that phase and which I next consider.

Most of the features of the proposed contract with the Brooklyn Company are so similar to those of the contract with the Interborough Company that they need not be considered in detail. The most important feature differentiating the two contracts is that while the Interborough one contemplates the operation as a single system of various subways which are all owned by the city, the Brooklyn contract contemplates the operation of subways to be constructed and owned by the city in connection with a privately-owned transit system, and the only question which need be discussed at any length is whether this feature demands condemnation of the latter contract.

For the purposes of discussion the Brooklyn territory which the city of New York desires to supply with adequate transportation facilities may be regarded as consisting of two parts. Under the contract in question the city proposes to supply one of these parts with a system of subways constructed at a municipal expense of about $100,000,000, and equipped at an expenditure of

about $25,000,000, and which subways will be owned by the municipality and leased to a Brooklyn company for operation. Concededly, or at least unquestionably, the municipality might accomplish its purposes of securing a complete system by constructing at an expense of perhaps as many more millions of dollars additional subways in the remaining territory. It, however, finds this latter territory occupied by a privately-owned transit system which, being extended and bettered and operated in conjunction with the subways to be constructed as aforesaid under a single fare, will furnish a complete system for the entire territory, and the question is whether the municipality instead of building subways at an enormous expense over the entire territory may build them in part of it and then make a contract for their operation with the owner of the privately-owned system under which the latter agrees to operate its system in conjunction with the subways and subject to a single fare. It seems to me that it may thus do, and that the statement of the proposition very largely supplies the argument in its favor.

The power to build and own railroads because effecting a proper municipal purpose must include the lesser power to perfect an incomplete municipal system by leasing for a limited term a privately-owned system to be operated in connection with it. The general rule is that a municipality may acquire property for proper purposes by lease as well as purchase. (*Alter* v. *City of Cincinnati*, 56 Ohio St. 47.)

The power thus to lease outright a privately-owned road again must include the lesser and fairly incidental power on the part of the municipality to make a traffic or transportation contract with the owner of a private road whereby the latter will be operated in connection with the former's road under such a system of transfers between and fares over the two systems as the municipal representatives deem for the best interest of the public.

If this reasoning is correct it covers the present case,

for the principle is all that concerns us; the terms are matters for the judgment of those who represent the municipality. If the latter could agree for connecting points and that a passenger starting on one system should be carried over both for a fare of ten cents to be apportioned in each case between the two, they can, so far as our powers of review are concerned, make a bargain that the fare shall be five cents instead of ten and that the aggregate of all the fares shall be divided instead of each one singly.

Furthermore, if the municipality has a right to contract with the lessee of its roads that such lessee shall subject its own system to a single fare it has a right to bargain for proper compensation to be given for the privilege thus secured and for the rental which it is to receive for its own property when operated under conditions of a single fare. This covers and justifies the provision for a preferential payment from the proceeds of the entire system of an annual sum equal to the earnings now derived from the Brooklyn Company's system under its own method of operation, and it also covers and justifies the equal division between the municipality and the operating company of the balance of the proceeds from the operation of the entire system after making the various payments provided for. It is vigorously urged in the case of the Brooklyn contract as in the case of the Interborough one that the yearly preferential sum to be paid from earnings to the privately-owned company is excessive. That may be so. I do not pretend to know. But even if it should be believed that it is, that consideration is not within our jurisdiction. The Brooklyn Company proposes to spend at least $26,000,000 in bettering and extending its system and then subject that system to a much lower fare than it now receives. The city requires this in the public interest. For this and other considerations, the company exacts the payment in question. It may prove so large as to be very profitable, but no one claims that in agreeing

to it the public officials are acting in bad faith or that the
transaction is a pretense and a fraud, and that being so
we have no power to interfere with it.

I do not think that the provisions of the Brooklyn con-
tract bring the municipality any nearer in principle to a
prohibited partnership of municipality and private indi-
vidual than do the provisions of the Interborough con-
tract, and I fail to see any gift or loan of money, prop-
erty or credit by the municipality to the company within
the words or spirit of the Constitution as interpreted
by Judge HAIGHT in the *Sun Printing & Publishing
Association* case for application to such a case as this.

The city constructs and leases its subways to the com-
pany for a consideration or rental to be paid from the net
earnings and it affords to its lessee an opportunity to
derive profit from the lease by receipt of a like share of
such earnings. There is no gift or loan in this, but an
ordinary contract for a consideration just as valid in the
case of a municipality as in the case of an individual.

It exacts from the lessee that it shall expend large
sums for bettering its system and that it shall operate
such system in connection with or in subordination to the
municipal road under a reduced fare, and for these rights,
in the interest of the public, over the private road, it pays
a consideration. The question whether the municipality
has the power to make this agreement may be the sub-
ject of debate. I have attempted to cover that. But
however that may be I look in vain for what seems to
me to be a gift or loan.

It is not possible to review at length the authorities
cited by the appellants to establish the illegality of the
proposed contracts. They are mainly made by the courts
of Ohio, and in most of them the basis of condemnation
is the embarkation by the municipality on some scheme
clearly transcending the limits of municipal purposes or
an unlawful union of municipal and private property
rights. When we keep in mind that under the Brooklyn

contract, most favorable for the appellants' argument, the municipality and the private corporation each retains the title to and ownership of its property, and that the only joinder of the two is under a contract for joint operation for a limited period, we see that this comes far from presenting a situation such as was held to be illegal in *Alter* v. *City of Cincinnati* (56 Ohio St. 47) which of the Ohio decisions cited by the appellants is especially relied on.

In that case the court had before it for consideration a constitutional provision not unlike that now before us as affecting the validity of a statute for the construction and extension of water works by municipalities. In brief this statute provided that a municipality and a private owner might become the joint owners of *indivisible* interests in a single water system, and this was condemned by the court. The court said: "When the enlargements, extensions, improvements and additions shall be thus made, completed and connected with the existing water works so owned by the city, the enlargements, extensions, improvements and additions together with the existing works, all taken together, will constitute one completed whole — one water works system, one water works — owned in part by the city and in part by the individual or corporation, and thereby the union of public and private capital and funds in one enterprise will become complete. The provision that the works shall be operated, managed and conducted by the city does not relieve the matter, because, before the city can operate the works it must first obtain a lease upon such terms as may be agreed upon, and that puts it beyond the power of the city to operate and control the works as sole proprietor. It would be a joining of two properties owned by different parties together to make one property, the parts owned by each being necessary to the successful operation of the whole, and each owner having his say as to the terms and conditions upon which the whole should be operated. The existing water

works would be so tied to the extensions as to be dependent upon them, and the extensions would be so tied to the existing water works as to be of little value without them. It is this close connection and dependence one upon the other that constitutes both together as a single whole, and makes a union of public and private funds and credit. The existing works are to be connected with the new improvements, and are thereby to lend aid to the person, company or corporation making and owning such new improvements. The case is not like a city leasing a building or water works plant owned by another, because in such case the leased property would stand upon its own merits and would not, before or after the lease become merged into the other property of the city so that the whole would become one property, and make the property of the city dependent upon the leased property for its value and utility."

It remains to consider the only other objections to the contracts, one constitutional and the other statutory.

First, it is said that the Rapid Transit Act violates that section of the constitution which provides, "The Legislature shall not pass a private or local bill in any of the following cases: * * *

"Granting to any corporation, association or individual the right to lay down railroad tracks. * * *

"The Legislature shall pass general laws providing for the cases enumerated in this section, and for all other cases which in its judgment, may be provided for by general laws." (Art. 3, section 18.)

The reasoning by which appellants seek to establish a violation by the statute of these provisions is as follows:

The Rapid Transit Act by its terms affects only cities having a population of over one million. It depends for its execution upon the acts of the public service commission of the first district. That district includes only the counties of New York, Kings, Queens and Richmond,

and these counties are all included since the act of consolidation in the city of New York. It, therefore, follows that the act is limited to the city of New York and becomes a local act.

This argument, even if well founded, would not apply to those provisions of the statute and contracts providing for the construction by the municipality of subways, it having been held in the *Sun Printing & Publishing Association* case that such subways were not of the character of railways referred to in the constitutional provision which has been quoted. The argument, however, would, if well founded, apply to those provisions of the act providing for the grant of franchises to corporations for the construction and operation of railroads in the rapid transit system.

I think, however, that the statute does not come within any constitutional prohibitions of the character urged. While it is true that if we should go outside of the statute we should ascertain that at the present time it affects only the city of New York, it would also appear that even at the present time except for the Consolidation Act affecting the cities of New York and Brooklyn and passed after the Rapid Transit Act was passed, the latter would apply to two cities, and there is no conclusive presumption that it will not apply to other cities in the future. The act is general in its terms as applicable to cities of a certain size, and in that respect, subject to the consideration of another constitutional provision, is valid and not a case of local legislation. (*Matter of N. Y. Elev. R. R. Co.*, 70 N. Y. 327; *Matter of Church*, 92 N. Y. 1; *People ex rel. N. Y. El. Lines Co.* v. *Squire*, 107 N. Y. 593; *Matter of Henneberger*, 155 N. Y. 420.)

It is, however, urged that the principles settled by the foregoing and other decisions are not applicable because of the further constitutional provision which was adopted in 1894, providing as follows:

"Classification of cities; general and special city laws;

special city laws; how passed by Legislature and accepted by cities.— § 2. All cities are classified according to the latest state enumeration.   *   *   *   The first class includes all cities having a population of one hundred and seventy-five thousand or more   *   *   *. Laws relating to the property, affairs or government of cities, and the several departments thereof, are divided into general and special city laws; general city laws are those which relate to all the cities of one or more classes; special city laws are those which relate to a single city, or to less than all the cities of a class." (Art. 12, section 2.)

It is said that because the Rapid Transit Act does not relate to all cities of the first class, it is a special city law which can only be passed as by the Constitution provided.

Again, I disagree with the contention of the appellants. In the first place the Rapid Transit Act was passed before this constitutional provision went into effect. In the second place, the act is not one of those contemplated by the provision in question. The latter contemplates laws which relate to municipal property and affairs and which may be described, as the provision does describe them, as "city" laws. To come within the precise provision which is invoked here it would be necessary to hold that the Rapid Transit Act was "a special city law." It seems to me that this term could not be regarded as a reasonable description of the statute before us. It was adopted not only for the benefit of the cities which, of course, would be affected, but of the public at large, and it confers broad powers, including that of the granting of franchises. It is a much more general law than is contemplated by the provision in question. (*People ex rel. Einsfeld* v. *Murray,* 149 N. Y. 367; *Matter of Henneberger,* 155 N. Y. 420.)

The second objection calls for an interpretation of certain provisions of the Rapid Transit Act. It is argued that there should be a referendum before execution of the contracts. It is very doubtful whether that objection is

presented by the complaint in the *Hopper* case where alone it is argued. But assuming that it is, it cannot be sustained.

The original act of 1891 did not contain any provisions for municipal construction. The municipal construction and referendum provisions were added by chapter 752 of the Laws of 1894. By this statute section 34 of the Rapid Transit Act, as amended, provided for municipal construction in case the people should so determine under the referendum provisions contained in sections 12 and 13 of the amendatory act, and section 7 of the act as thus amended provided for public sale of franchises in case the vote on referendum should be against municipal construction. The municipal construction section was frequently amended prior to 1909, but so far as I have examined these amendments they all continue the provision whereby municipal construction was made dependent on the result of the referendum. But by chapter 498 of the Laws of 1909 the Rapid Transit Act was revised. The private construction section, as amended in 1894 making private construction dependent upon a vote of the people adverse to municipal construction, was expressly repealed and a new section (section 22) was added authorizing private construction without reference to the results of referendum. The municipal construction section (theretofore section 34), as amended from time to time, was renumbered as section 26 and was further amended by the elimination of all limitation by or reference to the results of referendum. By the re-arrangement of section 65 all acts and parts of acts local or general inconsistent with the act as amended by the amendments of 1909 were expressly repealed.

Under these circumstances it seems to be clear that the argument for the necessity of a referendum before execution of the proposed contracts is without foundation.

The judgment in each case should be affirmed, with costs.

CULLEN, Ch. J. (dissenting). I vote to reverse the orders below and to grant the injunctions asked. In my opinion the contracts about to be entered into by the city of New York, the execution of which it is the object of these actions to restrain, plainly violate the constitutional provisions restraining the power of the city to incur debt or dispose of its money, property or credit. These provisions, as found in article 8, section 10, of the present Constitution, are: "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, or become directly or indirectly the owner of stock in, or bonds of, any association or corporation; nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes. This section shall not prevent such county, city, town or village from making such provision for the aid or support of its poor as may be authorized by law." It will be observed that here are enacted two separate and distinct prohibitions, each absolute and unqualified. Stated tersely, the first was intended to prevent the contribution of municipal capital or credit to or in connection with private capital in any scheme of public improvement; the second, to limit the devotion of municipal capital or credit to a municipal purpose of the municipality. These provisions were first incorporated into the Constitution by the amendments adopted in 1874. They were not adopted for the purpose of prohibiting the employment of public funds or credit for a private purpose, for it was the law of the state before the adoption of the amendment that municipal funds should not be applied in aid of private enterprises. In *Weismer* v. *Village of Douglas* (64 N. Y. 91) it was held that a statute authorizing a village to subscribe for the stock of a manufacturing corporation to be located in the village and to improve a water power there situated was unconstitutional and void, because the enterprise was of a pri-

ADMIRAL REALTY CO. *v.* CITY OF NEW YORK.   143

1912.]   .   .Dissenting opinion, per CULLEN, Ch. J.   [206 N. Y.]

vate character.   Therefore, the effect of the amendment, taken in connection with the previously existing constitutional restraints, was not only to limit the application of municipal funds to enterprises of a public character, but to restrict such application to a public enterprise which was peculiarly a municipal purpose, and even then to forbid the application in such a manner as would operate as a gift of any money or property, or a loan of money or credit to or in aid of any individual, association or corporation.   Illustration may serve to make clear the different applications of the two constitutional provisions. The construction and operation of a railroad is a public purpose.   Otherwise, under the Constitution of this state, a railroad company could not condemn a foot of its right of way.   The city could build a railroad within its limits for urban travel, because such would be a city purpose (*Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.,* 152 N. Y. 257), but not a railroad to Philadelphia, because the purpose of the enterprise in the latter case, though just as public as in the case of the local subway, would not be municipal.   (*People ex rel. Murphy* v. *Kelly,* 76 N. Y. 475.)   In other words, to save the scheme of municipal expenditure from condemnation under this constitutional prohibition, the purpose thereof. must be both public and municipal.

Thus far the second constitutional limitation alone has been involved.   But if, instead of the city owning and constructing the municipal railroad, the plan was that it should be constructed and owned by a private corporation, though the purpose in such case would be just as public and just as municipal as when the road was to be owned and operated by the municipality, and though the exigency for the public work might be most urgent, the city by the express provision of the Constitution would be · forbidden to give or lend a dollar or a dollar's worth of property to or in aid of the corporation, or to buy a share of its stock or one of its bonds.   The only question I shall

discuss is whether the proposed contracts which are the subject of this litigation are in conflict with this con-stitutional inhibition.

Before detailing the provisions of the contracts it may be well to consider two arguments made in support of their validity. They are general in their character and not dependent on the specific details of the contracts. *First*, it is urged that the contracts are merely leases of the property, and that the power of the city to lease the subway was distinctly declared in the case of *Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y. (supra).* It is asked whether the lease by the city of one of its piers to a steamship company is a gift or loan of the money, property or credit of the city and, therefore, illegal. The illustration will be accepted and the answer seems plain. The legality depends on the terms of the lease. If the pier is rented for its fair rental value or in an honest effort to obtain such value, whether the rent reserved be too high or too low, of course the lease is good. But if the lease should provide that in consideration of the company's agreement to carry residents of the city of New York at half the regular rates of passage, the rent should be only one dollar a year, manifestly it would violate the constitutional provision, because giving the use of the property of the city without its marketable return is a gift of the city property. So, also, if the lease in consideration of such an agreement should provide that the company pay a reduced rental, it would be a gift of the city property *pro tanto* and equally illegal, for if part of the consideration of a contract be illegal, the whole contract is void. (*Saratoga County Bank* v. *King,* 44 N. Y. 87; *Foley* v. *Speir,* 100 id. 552; *Trist* v. *Child,* 21 Wall. 441; *Meguire* v. *Corwine,* 101 U. S. 108.)

The second argument presented to us, apparently seriously, seems to me very curious. It is to the effect that there can be no gift or loan of the city property by these contracts, because the title remains in the city. Under

the proposed contracts, even assuming them to be strictly leases, the railroads will acquire an estate in the demised premises, which is just as essentially property, surrounded by every constitutional safeguard for the protection of property, as is the reversion at the expiration of the lease. (Real Property Law, section 30.) "Such estates may be, and often are, of a far greater value than a life estate" (*Averill* v. *Taylor*, 8 N. Y. 44), and a life estate is often worth far more than the remainder in fee. The life estate of a widow or other person under fifty-one years is worth more than one-half the present value of the property, and the interest of the owner of the reversion is worth less than one-half. Therefore, the question in whom is the greater interest or ownership in a piece of real property — the tenant or the landlord — depends entirely on the length of the demised term and the rent reserved. The term proposed to be given by the city to the two railroad companies is forty-nine years, and the value of that estate if no rent is paid (and certainly it is possible, if not probable, that the city may receive no return) is, assuming an interest rate of 4%, over 85 per cent, or more than five-sixths of the value of the property, and the interest retained by the city less than 15 per cent, or one-sixth of the present value of the property. Therefore, if the city, by the terms of the proposed leases, grants the subway to the lessees for a term of forty-nine years with or without rental, or devotes what would be a rental to a purpose forbidden by the Constitution, it just as much conflicts with the Constitution as if it were to give to the railroad companies a present conveyance of five undivided sixths of the property, retaining one-sixth for itself.

This brings us to a consideration of the terms of the proposed contracts, the details of which are set forth in the opinion of my brother HISCOCK. In this opinion I shall discuss only the contract of the Brooklyn Union Elevated Railroad Company. The questions involved in

the two cases are in reality the same, though I am frank to say that I select that of the Brooklyn Company, because in my judgment its offense against the Constitution is more flagrant and more readily appreciated than that of the other.

The salient and controlling terms of the proposed lease to the Brooklyn Company are as follows: That company either as owner or lessee controls about 105 miles of elevated or steam railroads in the borough of Brooklyn. The city is at present engaged in the construction of two subways, one in the borough of Brooklyn, on Fourth avenue, and the other in the borough of Manhattan, connecting the termini of the bridges across the East river, aggregating in length seven and two-tenths miles, which will cost when completed, according to the estimate of the public service commission, $27,800,000. Under the contract there is to be built at the city's charge fourteen and six-tenths miles of additional subway at an estimated cost of $58,400,000. The railroad company is to construct a connecting subway of a mile and one-tenth at an estimated cost of $3,200,000. It is to extend and improve its own lines at an expense of $23,400,000, and to equip both at an estimated cost of $24,000,000. These figures of the public service commission are the lowest given in the negotiations between the parties — the railroad company estimating the cost of the improvement to be defrayed by it at $50,000,000, and the city's expenditure at over $90,000,000. When completed the city roads are to be leased (?) to the railroad company for the period of forty-nine years and both roads are to be operated by the railroad company, the receipts from all being pooled in a common fund, out of which is to be disbursed annually in the following order: 1. Operating expenses, taxes, rentals, etc. 2. Depreciation, etc. 3. To the operating company $3,500,000 annually to cover net earnings of existing elevated lines. 4. Interest on cost of extensions and equipment incurred by the company. 5. Sinking

fund for account of equipment and extensions of private lines.   6.   Interest and sinking fund upon the investment by the city.   7.   Net profits to be equally divided between the private corporations and the city.   8.   If the income during any year is not ample to pay the sum fixed as net earnings of the existing elevated lines, or interest on cost of extensions and equipment, the loss is to be borne by the operating company.   Interest on the investment by the city is cumulative.

That this contract creates a partnership, and a very one-sided partnership at that, between the city and the railroad company seems to me entirely clear.   Indeed, it is so denominated by the railroad company in its proposals to the city.   That if the agreement was between private individuals or corporations it would create a partnership is settled law, because the parties are entitled to share in the profits as such (*Manhattan Brass & Manfg. Co.* v. *Sears,* 45 N. Y. 797; *Burnett* v. *Snyder,* 81 id. 500, 555; *Leggett* v. *Hyde,* 58 id. 272), though it must be conceded that the city's chance of sharing is somewhat remote.   But it is contended, assuming that a partnership is created, that there is no violation of the constitutional provision.   The learned judge who decided the case at Special Term has written: " The city does not give its property, it leases it; the city does not guarantee the yearly $6,335,000, for it does not pledge its credit that this amount will be realized; leasing property, even if the lease be so valuable as to enable the lessee to borrow on it, is not lending the lessor's credit to the lessee, and finally, there is no express prohibition in the Constitution against mingling public and private property, or against a partnership."   I am constrained to differ with the court on each of these propositions.   I have already shown that a gift of property may be as easily made by a lease as by a conveyance of a fee.   It seems that there are in this state leases for 990 years at an annual rent of three peppercorns.   (*Trustees of Elmira* v. *Dunn,* 22 Barb. 402.)   Who is the real owner

of the property, the landlord or the tenant? The gift of the use for a year of a building renting for $20,000 annually is greater than the gift of the fee of a building worth only $10,000. Equally clear is it that a city may loan its money or credit to a corporation without guaranteeing its bonds or other obligations. It is urged that the constitutional inhibition is against loaning money or credit, but not against loaning property. Even that technical argument fails in this case because the agreements to spend the money to build the subway and to lease it when built are but interdependent parts of a single and entire contract. If, therefore, the terms of the lease are such that the use of the property is given in aid of the corporation, the money which the city agrees to expend to create the property is equally so given. So, also, while the word partnership is not mentioned in the constitutional inhibition, it is as clearly condemned as if named, for the inhibition is in terms so comprehensive as necessarily to include partnerships. In every partnership the credit of each partner is pledged so far as the common venture is concerned in aid of each of his copartners, except in a special partnership, and there the capital contributed by the special partner is equally pledged for the same purpose. On this last proposition authority is not wanting.

The Constitution of the State of Ohio prescribed that: "The general assembly shall never authorize any county, city, town or township, by vote of its citizens or otherwise, to become a stockholder in any joint stock company, corporation or association whatever, or to raise money for, or loan its credit to, or in aid of any such company, corporation or association." The provision is so similar to that now found at a later time in our Constitution that doubtless our provision was borrowed from it. Certainly ours is no less broad. The effect of the Ohio constitutional provision has been several times before the court of last resort in that state. The first case was that of

*Walker* v. *City of Cincinnati* (21 Ohio St. 54), where
the validity of a statute authorizing the city of Cincin-
nati to build a railroad to Knoxville was upheld (there
being no constitutional requirement such as there is in
this state which limits the application of municipal
money or credit to a municipal purpose). But the court,
discussing the constitutional provision, said: "The mis-
chief which this section interdicts is a business part-
nership between a municipality or subdivision of the
State, and individuals or private corporations or associa-
tions. It forbids the union of public and private capital
or credit in any enterprise whatever. In no project orig-
inated by individuals, whether associated or otherwise,
with a view to gain, are the municipal bodies named per-
mitted to participate in such manner as to incur pecuniary
expense or liability. They may neither become stock-
holders nor furnish money or credit for the benefit of the
parties interested therein." The next case was *Wyscaver*
v. *Atkinson* (37 Ohio St. 80), in which an act of the legis-
lature authorizing a township to raise $20,000 towards
the making of a line of railway was held unconstitutional
and void. The court said, repeating: "The mischief
which this section interdicts is a business partnership
between a municipality or subdivision of the State and
individuals or private corporations or associations. *It
forbids the union of public and private capital or credit
in any enterprise whatever.*" *Counterman* v. *Dublin
Township* (38 Ohio St. 515) is to the same effect. In *Alter*
v. *Cincinnati* (56 Ohio St. 47) it is held that the city must
be the sole proprietor of property in which it invests its
public funds, and it cannot unite its property with the
property of individuals or corporations, so that when
united both together form one property. It was said:
"The city may lease from an individual or corporation
any property of which it may need the use, or having the
property the use of which it does not need, it may lease
the same to others, but it cannot engage in an enter-

# 150 ADMIRAL REALTY CO. v. CITY OF NEW YORK.

prise with an individual or corporation for the construction or erection of a property which, as a completed whole, is to be owned and controlled in part by the city, and in part by an individual or corporation."

The effect of this constitutional prohibition came before the Supreme Court of the United States in *Pleasant Township* v. *Ætna Life Ins. Co.* (138 U. S. 67), where a suit had been brought in the Federal courts against a town to recover on bonds issued under the statute which was condemned in the cases cited from 37th and 38th Ohio reports. That court held that as the bonds were issued before the Supreme Court of the state of Ohio had decided their invalidity, the Federal courts were not constrained to follow those decisions, but required to determine the controversy on their own judgments. Nevertheless, the Supreme Court, reversing the lower court, held the statute void, agreeing with the Supreme Court of Ohio and quoting with approval the excerpts which I have already given. Thus, there is very respectable authority that the contracts before us are bad.

But even if we were to assume that a business partnership between a municipality and a private corporation would not in all cases conflict with the Constitution, the terms of this agreement are such as necessarily condemn it. The city is to contribute over $90,000,000 of its capital. Out of the net income realized from the joint operation of the city roads and the company roads there is first to be paid to the railroad company $3,500,000, or, as stated in its letter, about 6% on the capital represented by such roads. For forty-nine years the income realized from the city's investment of $90,000,000 is pledged to secure an annual return of $3,500,000 to the railroad company. It may possibly be that the earnings from the existing lines of the railroad company, if it were practical to separate them from the common fund, will equal that amount. That, however, is immaterial. The property of the city is nevertheless pledged to secure the company that return.

The test is simple. If the subways should be taken from the city and the railroad company by the state under the power of condemnation, assuming that the award for the property equalled its cost, $90,000,000 of the city's money would have to be held in court for forty-nine years, or the unexpired term thereof, or its equivalent, $76,000,000, in perpetuity to make good any deficiency in the railroad company's own lines, unless, of course, the railroad company chose to make some new agreement with the city to effect the release of the fund. This statement, however, is to be modified by the right of recaption reserved by the contract which may be exercised after ten years on condition that the city pay the railroad company 15% additional on the $50,000,000 invested by the company, or $7,500,000. The value of the ten years' estate (during nine years of which the company in its proposal concedes the city can expect no return) is 32½%, or the equivalent of about $29,000,000 in perpetuity, to which is to be added the $7,500,000 already mentioned. Therefore, the instant the subway is completed, under the most favorable conditions of the contract, the equivalent of $36,500,000 of the city's money or property is pledged to secure the stipulated return on the railroad company's capital. These calculations again are made on the assumption that the prevailing rate of interest is 4%. If a higher rate should be taken, the conditions imposed would be more unfavorable to the city. In this view it seems to me idle to argue that the money and credit of the city is not to be given in aid of the Brooklyn Company. If a person being applied to by a neighbor to indorse a note for $1,000 should give him a $1,000 government bond on which, as collateral, to borrow the money from some third person, it is exactly the same as if he had indorsed the note or himself loaned the maker the money.

The difference between the views of the majority of the court and myself lies here: They think that because a municipality may acquire property for a municipal

purpose, it may acquire it on just the same terms and conditions as might be assumed by a private corporation or individual. This I deny. The terms and conditions assumed by the city must not conflict with the constitutional provision, however indisputable the right of the city to acquire the property may be. For instance, a street railroad company might convey one of its branch lines to another company in consideration of the latter company guaranteeing the payment of the outstanding mortgage bonds of the former, or agreeing to loan it an amount of money. The city could make no such bargain, because the Constitution prohibits it. The same rule would apply to the terms of an agreement made by the city to lease a line of railroad. I am at a loss, however, to see how there can be spelled out of the proposed contract an agreement of the city to lease the lines of the Brooklyn Company, unless, possibly, on the theory that in the operation of the combined roads the city and the company are partners, which the majority opinion expressly repudiates. Equally aside from the point in issue is the analogy found in the country practice of letting a farm on shares. Assuming that the power granted to an executor or trustee to lease a testator's farm would authorize renting it on shares, it certainly would not authorize the pooling of receipts of the farm with those of several other farms and an apportionment of the common fund so realized. Yet this is what the contract requires the city to do.

I do not discuss the question whether the terms of the proposed contract are fair or unfair. The sole question is, do they violate the constitutional provision. Equally aside of the mark is all discussion of the necessity of the city for new means of transit or of the sacrifice which the contract requires the company to make, and the consideration which, under its terms, the company is to advance. As already said, the Constitution does not forbid the city doing certain things without consideration, but doing them at all with or without consideration. It may not

invest in the company's stock or bonds no matter how favorable the terms, nor guarantee the company's securities no matter how absolutely sufficient is its indemnity from loss by the guaranty.

The decision of this court in the case of *Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.* (*supra*) does not in any degree sustain the validity of the proposed contracts. There. it was held that the city might build a subway and lease it to a company for a term of years for a fixed annual rental payable in money equal to the interest on the city's outlay and also sufficient to amortize the principal invested at the expiration of the lease. In other words, what was done in that case is exactly the same as is done with piers. The city builds them; the companies hire them and pay rent, the rent being no way dependent on the profits of the steamship companies. It is the method in which the income derived from the use of the city's property is to be applied that occasions the whole controversy in these cases, with which the decision in the *Sun* case in no way deals.

It has been suggested that possibly a dissent in these cases may be of value, as it will check the further extension of schemes for loaning the city's money, property or credit. Those who indulge in this belief but "Listen with credulity to the whispers of fancy." It would be ungracious not to make recognition of the great skill and ability displayed by the lawyers and financiers who have formulated these contracts in their efforts to make the evasion of constitutional restrictions practicable. But their successors may be found, and even their own services may again be brought into requisition. The corporations controlling the Brooklyn and the New York railroads each holds and operates many miles of street surface railroads. After their present success they may deem it wise to obtain a guarantee of the income of such property through a pledge of city property by a scheme similar to the present one. Of course, if subway roads can be com-

bined with elevated roads, equally can they be combined with surface roads; but if we assume these companies will rest satisfied on what they now obtain, there are other railroad companies in the city of New York who, on the principle that equality is equity, will seek their chance at the city treasury. Nor do I see how the principle about to be decided can be confined to railroads. With the utmost respect for the majority of the court, I fear that the decision about to be made will lead to a practical nullification of the constitutional restraints by methods of evasion. It may, however, prove interesting to that school of publicists and political economists which has always maintained the futility of restraints imposed by the people themselves on their own extravagance in the expenditure of public moneys, on the ground that when the popular demand is not great the restraints are unnecessary, and when great they are unavailing.

WERNER, J. (dissenting). The appeals are from three judgments sustaining demurrers to complaints in taxpayers' actions brought to test the validity of two contracts under which it is proposed to extend and unify the rapid transit railways in the city of New York. The complaints attack these proposed contracts on the ground, *inter alia*, that they violate the provisions of article 8, section 10, of our State Constitution, which declares: "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, or become directly or indirectly the owner of stock in, or bonds of, any association or corporation." Thus far the courts have held that these proposed contracts are not in contravention of this constitutional mandate, and a majority of this court are about to concur in this conclusion. Although I do not favor the writing and publication of dissenting opinions when they serve no purpose save to emphasize divergence of judicial views, this is one of

those exceptional cases in which an important constitutional question justifies the fullest discussion from every side. My dissent from the conclusion reached by the majority of my brethren is based on the broad ground that the contracts which are the subjects of consideration, no less than the legislation by which they are authorized, are fundamentally repugnant to the letter and the spirit of the constitutional provision above quoted.

The contract with the Brooklyn Company, stripped of unnecessary details, provides that the city shall construct an addition to the Fourth avenue line in Brooklyn, now in course of construction; a line under the East river to the Battery, in Manhattan; a line from the Battery by way of Church and Vesey streets, to Broadway; a line through Broadway to 42nd street and through Seventh avenue to 59th street easterly to and over the Queensborough bridge, there to connect with the elevated lines of the Brooklyn Company. The Brooklyn Company shall construct, at its own expense, an elevated extension from the old city line easterly in the borough of Queens to Jamaica; an elevated extension from the Williamsburg bridge northerly to the Queensborough bridge; an elevated extension from the present terminus of its Third avenue line to Bay Ridge and otherwise; and shall third track its lines on Fulton street, Myrtle avenue, Broadway and other streets.

The Brooklyn Company is to equip and operate all these lines as a single system for a uniform fare of five cents per passenger. The city lines are to be leased to the operating company for a period of forty-nine years subject to the city's right to take over the new lines after the lapse of ten years. The estimated expenditure of the city in the completion of lines now under construction and the new lines to be built will be over $86,000,000 and may be much more, and the Brooklyn Company is to invest over $50,000,000 in construction and equipment. These bare outlines of the proposed compact between the

city and the Brooklyn Company very pointedly suggest that the arrangement is a joint venture in the nature of a partnership, but there are further details which serve to disclose more positively its precise character. The contract further provides that the receipts from the existing system and the new subway lines are to be pooled and from the gross receipts of both lines there shall be paid: 1. The operating expenses, including all taxes, rentals of leased property used in operation. 2. Depreciation and renewals. 3. A sum of between $3,000,000 and $3,500,000, being the estimated income of the Brooklyn Company on its existing lines, which are to remain the property of the company. 4. Interest and sinking fund charges upon bonds issued by the company for construction and equipment. 5. Interest and sinking fund charges upon bonds issued by the city. 6. Any amounts in excess of these various payments are to be divided as profits, share and share alike. The distinctive features of this arrangement, briefly recapitulated, are that the city is to contribute subways and the Brooklyn Company is to furnish elevated and surface lines, each of which are to be separately owned but operated as parts of a single system under the management of the Brooklyn Company. In effect the city guarantees the payment of operating expenses, a fixed income on the lines now operated by the Brooklyn Company, the interest and sinking fund charges upon the bonds issued by the Brooklyn Company, and not until all these expenses have been met is the city to receive the interest upon its own bonds issued in aid of the joint enterprise. Finally, and as if to characterize the transaction, it is stipulated that the remainder of the profits, if any, shall be equally divided.

The proposed contract with the Interborough Company is somewhat different in detail, but not essentially different in kind. The city is. to contribute the present subways, which were built at the city's expense and are operated by the Interborough Company under lease, with

an equipment costing approximately $48,000,000. Additions and extensions are to be made under the joint auspices of the city and the Interborough Company at a cost of about $133,000,000, of which $77,000,000 will be contributed by the Interborough Company for construction and equipment, and about $56,000,000 will be given by the city for construction. The city is to have the legal title to the road, minus equipment. The Interborough Company is to operate the whole under a lease for forty-nine years, for a single fare of five cents per passenger, and the city is to have the right to take over the new lines at any time after ten years upon repaying to the Interborough Company a stipulated sum for construction which shall diminish in amount as the term continues and cease when the term expires. There are various reciprocal concessions, prominent among which is the so-called levelling of leases by which the leases now held by the Interborough Company are to be extended in one case for twelve years and for twenty-three years in the other. The gross receipts from the combined properties are to be pooled during the continuance of the lease, and from them the following deductions are to be made: 1. Operating expenses, including damages for accidents. 2. Provision for deterioration, renewals and obsolescence. 3. Taxes and insurance. 4. Rentals payable to the city under existing subway contracts. 5. Amortization of brokerage charges. 6. A sum to be paid to the Interborough Company in each year during the continuance of the proposed lease "to represent the average annual income from operation of the existing subway line and equipment for the two fiscal years ending July 30th, 1911, which is $6,335,000, as compensation for the pooling of the receipts of the existing subway and equipment with those of the new subway lines and equipment," for the levelling of leases, for the so-called "exchange of legs," for the Interborough Company's operation of the property, and for furnishing one-half of the cost of construct-

ing the new subways and the entire cost of equipping the same.   7.  The Interborough Company is to receive a sum equal to six per cent for each year during the term of the lease, upon its investment in the subway lines for construction and equipment, which, including its investment in the present subways, will make a total of about $125,000,000.   The contract further provides that " if any deficiency shall arise in any year in meeting the aforesaid payments to the Company, such deficiency shall be cumulative and shall be paid off and discharged annually out of the said subway earnings before the payments herein defined shall be made to the city."   Not until the foregoing deductions and cumulative payments have been allowed or paid to the Interborough Company is the city to receive any return upon its investment of $56,000,000 and upwards, and then " there shall be deducted out of the profits, interest, sinking fund upon the capital provided by the city for the construction of the new lines and such further sum as will bring the payments to be made to the city during the entire period of the forty-nine year lease up to an amount equal to 8.76 per centum per annum upon its capital investment in the original construction of the new subways."   The contract then further provides for the rate of compensation to the city for its capital investment in bettering or improving either old or new subways.   These payments to the city are also to be cumulative, subject to the preferential payments to be made to the company; and when all of the foregoing charges have been met, the remainder of profits shall be divided equally.   Under this contract, as under the contract with the Brooklyn Company, the salient features are that the city and the Interborough Company are to contribute to the enterprise what they now have in the way of construction or equipment. They unite in supplying the means for additions and extensions.   The city is to have title to the newly-constructed subways, but subject to the company's leasehold

for forty-nine years, unless that period can be anticipated by the making of some arrangement under which the city can buy out the company. Meanwhile the company is assured of preferential returns upon its huge investment while the city waits for what may be left.

That these two arrangements constitute two partnerships between the city and two private corporations does not admit of a doubt. In the case of the Brooklyn Company the point is frankly conceded. By whatever name these plans may be called they are joint enterprises in which the essential fact is that the city is lending its credit to two private corporations to the extent of their participation therein. In every partnership or joint venture each participant lends his credit to every other. In this case the legal status of the city, no less than the character of the arrangement, invests the two private corporations with a credit which they could not have without the city's participation. By the city's concessions these two private corporations are given a borrowing power without which the enterprise would be doomed from the beginning to certain disaster. It matters not whether the proposed arrangement is one which is apparently for the public good, or whether it may ultimately prove financially beneficial to the city. If the substance and effect of the transaction will be to commit the credit of the city to a venture in which private corporations are to be beneficiaries, it is a lending of the city's credit for purposes forbidden by the Constitution. It is true that the capital of the city is not to be pledged for the large underlying loans which must be secured by the two corporations in order to float the enterprise, but the income is to be pledged to secure these loans, and this is really the only tangible security, for without income the subways and other structures will be worthless. Very succinctly has one of the counsel for appellants stated the situation when he says: "To pledge the income is to pledge the capital, and this income the city proposes to pledge for forty-nine years,

to guarantee returns on the securities of private corporations."

I do not think we are foreclosed or embarrassed by our decision in the case of *Sun Printing & Publishing Assn.* v. *Mayor, etc., of N. Y.* (152 N. Y. 257). It was there held that the building of a subway is the building of a highway which is concededly a city purpose. It was also held that the Constitution does not prohibit municipalities from constructing their own roads and paying therefor when authorized by proper legislation. There the city built its own subways, and made a lease for their operation upon a fixed rental to be paid by the lessee. A majority of the court, speaking through Judge HAIGHT, united in an opinion in which the author, recognizing the narrow limits within which the case was to be decided, was very careful to limit his expressions to the precise facts then before the court. The opinion will be scanned in vain for even a single utterance which lends support to the contention, now before the court, that a railroad to be built with the combined capital of a city and private corporations, and operated by the private corporations for the benefit of all, is not in contravention of the Constitution.

With the merits of the proposed attempt to give the city a much needed improvement in its rapid transit facilities, the courts have no more concern than they have with the wisdom of the constitutional provision which is invoked by the appellants. It is clearly apparent that the city and the railroad companies are confronted with a problem which taxes human ingenuity and it may readily be assumed that it is being worked out with such degree of skill, wisdom and public spirit as befits so great an undertaking. Conceding all this, and much more, the plain duty of the courts is to uphold the Constitution as it is written even though it may be, for the time being, a hindrance to beneficent results. In the language of Chief Justice MARSHALL in *Marbury* v. *Madison* (1 Cranch, 137): "The Constitution is either a superior paramount

1912.] Dissenting opinion, per WERNER, J. [206 N. Y.]

law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the Legislature shall please to alter it. If the former part of the alternative be true, then a legislative act contrary to the Constitution is not law: if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable." Since we still profess to believe that a Constitution is " a superior paramount law," we should do no less than to uphold it in its integrity according to its letter and spirit. The language of the constitutional provision is plain. "No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation." (Art. 8, section 11.) If there were need for extraneous evidence as to the meaning of this language we should find it in the history of this addition to our Constitution. In was adopted in 1874 to prevent a continuance of the evils which had resulted from the so-called Town Bonding Statutes, under which municipalities had engaged in railroad and other enterprises with private corporations, and had issued municipal bonds in aid of purposes which, although intended to be of some public benefit, were essentially and fundamentally private in their ultimate ends. There the railroad corporations were private concerns, although incidentally serving a public purpose. Here the railroad companies are private corporations also incidentally serving a public purpose. He would be a brave man who would now dare to assert that a town may issue bonds to assist in the building of a railroad to be owned and operated by a railroad corporation. Yet, in the case at bar it is proposed to legalize a transaction which is no different in principle. Here, it is true, the city has the title to the subways which are to be built, but the leasehold, the thing that gives the naked fee its value, is turned over

11

for forty-nine years to private corporations in order that they may mortgage it to raise their contributions to construction and equipment. Into an enterprise characterized by these elements the city is to pour its millions. If that is not a lending of municipal credit to or in aid of private corporations, then I think we should frankly concede that our Constitution is an absurd attempt on the part of the people to limit a power in its own nature illimitable, for from this time forth it will be difficult, if not impossible, to define the constitutional limitations of municipal powers.

HAIGHT, VANN and COLLIN, JJ., concur with HISCOCK, J.; CULLEN, Ch. J., and WERNER, J., read dissenting opinions; GRAY, J., takes no part.

Judgment affirmed.