(Nos. 20993, 21019.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, *vs.* THE CITY OF CHICAGO *et al.* Appellees.—ELIZABETH M. BASS *et al.* Appellants, *vs.* THE CITY OF CHICAGO *et al.* Appellees.

*Opinion filed July 26, 1932.*

306

Dunn, J., dissenting.

Appearances in 20993: Oscar E. Carlstrom, Attorney General, and John L. McInerney, for appellant; William H. Sexton, Corporation Counsel, Walter L. Fisher, Allan T. Gilbert, Schuyler, Dunbar & Weinfeld, and Cooke, Sullivan & Ricks, for appellees; Lester L. Falk, Homer H. Cooper, Frank H. Scott, and John E. MacLeish, *amici curiæ*.

Appearances in 21019: Butler, Foster, Pope & Ballard, Brundage, Landon & Holt, Hamlin & Cleary, and Sidney J. Frank, (Stephen A. Foster, Herbert Pope, Frank E. Harkness, Charles G. Little, Edward J. Brundage, and Harry F. Hamlin, of counsel,) for appellants; William H. Sexton, Corporation Counsel, Walter L. Fisher, and Allan T. Gilbert, for appellees.

Mr. Justice Orr delivered the opinion of the court:

The first entitled of these two consolidated cases is an appeal from an order and judgment of the circuit court of Cook county dismissing on the merits an information in *quo warranto* brought by the Attorney General on behalf of the People against the city of Chicago and Charles F. Clarke, E. T. Cunningham and Phelps Kelley, as respondents. The information there alleged, in substance, the following: On May 19, 1930, the city of Chicago passed an ordinance entitled "An ordinance providing for a comprehensive unified local transportation system to be used mainly for the transportation of persons in the city of Chicago and in the adjacent and suburban territory comprised within the metropolitan area of the city of Chicago, and granting a terminable permit for the establishment, maintenance and operation of such system, and for the use therefor of streets,

alleys, subways, public ways and public grounds in said city, reserving to the city or its permittee the right to purchase such system." This ordinance will be referred to herein as the "Comprehensive Traction Ordinance." The ordinance was submitted to and approved by the voters of the city on July 1, 1930, pursuant to one of the statutes of 1929, hereinafter referred to as the Terminable Permit act. (Laws of 1929, p. 271; Smith's Stat. 1931, chap. 131¼, p. 2845.) The information charged that the ordinance was passed pursuant to the so-called enabling legislation adopted by the General Assembly and approved June 19, 1929, consisting of the Terminable Permit act; also an act referred to as the Subway act, entitled "An act to authorize cities, villages and incorporated towns to construct or otherwise acquire subways and tunnels and to operate or lease the same and to provide the means for such construction, acquisition or operation;" (Laws of 1929, p. 268; Smith's Stat. 1931, chap. 24, p. 459;) also an act referred to as the Corporation Act Amendment of 1929, entitled "An act to amend an act entitled, 'An act in relation to corporations for pecuniary profit,' approved June 28, 1919, in force July 1, 1919, as subsequently amended, by amending section 2 thereof, and by adding thereto a new section to be known as section 3½ of said act;" (Laws of 1929, p. 289; Smith's Stat. 1931, chap. 32, p. 744;) and an act referred to as the Railroad act of 1929, entitled "An act to enlarge the powers of railroad companies." Laws of 1929, p. 591; Smith's Stat. 1931, chap. 114, p. 2311.

The information charged that in passing the ordinance the city exercised powers under the enabling legislation of 1929, and that each of the four acts was individually, and all were as a series of connected legislation, unconstitutional, and that the ordinance was invalid for this reason and also because certain of its provisions were invalid in themselves; that the ordinance purports to grant a permit to use the city's streets to the Chicago Local Transportation Company,

a pretended corporation; that the respondents Charles F. Clarke, E. T. Cunningham and Phelps Kelley are purporting to act as officers of said pretended corporation, but that said pretended corporation is illegal and non-existent because it was attempted to be organized under the 1929 Corporation Act Amendment, which is alleged to be invalid; that all the respondents are acting together, under the legislation of 1929, to accomplish the following, among other, "illegal" objects: To effect a unification of ownership and operation of the properties of street railway companies organized under the general Corporation act and the properties of the Chicago Rapid Transit Company, which was organized under the general Railroad Incorporation act; to sell the properties of the railroad corporation to a corporation organized under the general Corporation act; to obtain a perpetual permit; to obtain a donation from the city of Chicago of subways and to procure the city to lend its credit to the building of such subways; to create a unified local transportation system comprising both street railways and railroads within an arbitrarily created metropolitan transit area, and to procure the city of Chicago to incur indebtedness in excess of its constitutional debt limit. The information also charges that the city of Chicago, in combination with the individual respondents as officers of the pretended corporation, the Chicago Local Transportation Company, is taking steps and proceeding under the ordinance, and that the city has expended and is expending large sums of money to carry out its provisions. It concludes with the usual charge that the respondents are, and have been for several months, usurping powers not granted to them by the State of Illinois.

The city of Chicago filed its plea and the other respondents joined in a separate plea. Both pleas admitted that respondents had committed certain acts charged in the information but sought to justify principally on the basis of the legislation of 1929. The pleas asserted the validity of

all the acts and of the Comprehensive Traction ordinance. Thereafter the parties entered into an agreed case pursuant to the provisions of section 103 of the Practice act. The agreed case, after setting forth the pleadings, states the facts which preceded and gave rise to the passage of the legislation of 1929 and the ordinance of 1930. These facts are important as showing the circumstances under which the legislation was enacted and also for their bearing upon the reasonableness of the classification adopted by the legislature.

Since 1859, when the first street railway company was organized for operation in Chicago, there have been eighteen such companies in operation there. By means of foreclosure sales, leases, consolidations and otherwise, the properties of these companies were acquired by the four street railway companies now in operation. The properties of these companies have been operated as a unit since 1913 under a "unification ordinance" passed in that year, and those properties are now in the hands of receivers appointed by the District Court of the United States for the Northern District of Illinois, Eastern Division, and are being operated under the supervision of the receivers through an operating agency known as Chicago Surface Lines board of operation. The street franchises of these companies were granted by the city by ordinance in 1907 and they expired February 1, 1927. Since that time the surface street cars have been operated by virtue of temporary licenses or permits from the city, which by their terms were to expire January 31, 1932. These street car lines comprise more than 1000 miles of single track and 4000 street cars. During the fiscal year ending January 31, 1930, they carried almost 900,000,000 revenue passengers in the city. The number of rides furnished daily was 4,500,000, and of this number upwards of one-half of the passengers were carried within two periods aggregating five hours of each twenty-four hours. The surface lines carried more than seventy-seven per cent of the

total number of passengers carried by all the local transportation companies in the city. A decree for the sale of all the properties and franchises of these companies has been entered by the Federal court in the receivership proceedings.

Commencing in 1892 there were four distinct systems of elevated lines operating in the city of Chicago and its suburbs. These were operated upon elevated structures. The lines of these four systems have since been consolidated and are operated electrically as a single system under the ownership and management of the Chicago Rapid Transit Company. This company's system comprises 230 miles of single track and almost 2000 cars. In 1929 it carried almost 20,000,000 passengers, ninety-four per cent of whom were carried within the city of Chicago, and such traffic represented about seventeen per cent of the total of all passenger traffic in the city. The ordinance permits or franchises for operation of the elevated lines expire at different times but all within a comparatively short time in the future. The record shows that the future operation of these lines for the service of the public is dependent upon the adoption of some constructive program for a comprehensive unified local transportation system like the system contemplated by the Comprehensive Traction ordinance.

Prior to the passage of the ordinance of 1930 the Chicago Local Transportation Company was attempted to be organized as a corporation under the 1929 Corporation Act Amendment. It is named in the ordinance as grantee of the right to operate a unified local transportation system. One of the questions raised is whether this company is a corporation. The parties agree that if the 1929 Corporation Act Amendment is valid the Chicago Local Transportation Company is a validly organized corporation and the individuals named as respondents in the information are properly acting as officers thereof.

The agreed facts show that the ordinance of 1930 is the result of years of study and struggle to find a solution

of the local transportation problem in Chicago and its vicinity—a problem which seems to have become more difficult each year. It is asserted that the welfare and future development of Chicago and its metropolitan area depend to a large extent on the adoption of such a program. The ordinance of 1930 was approved by the people of Chicago at an election held July 1, 1930, more than eighty-five per cent of the total votes cast being in favor of its adoption.

Substantially the same questions are involved in the *Bass case,* (No. 21019,) which has been consolidated with the *quo warranto* case. The *Bass case* is a bill filed by Elizabeth M. Bass and others, as tax-payers, against the city and its officers, to enjoin expenditure of the city's funds under the Comprehensive Traction ordinance of 1930. The trial court entered a decree dismissing the bill for want of equity. The bill alleges the invalidity of the legislation of 1929 and the ordinance of 1930 upon various grounds. Suffice it to say that the complainants in the *Bass case* seek to raise substantially the same questions as are raised by the People in the *quo warranto* case, and the parties in the *Bass case* have entered into a stipulation in the trial court agreeing upon substantially the same facts as are stated in the agreed case which was entered into in the *quo warranto* case. Because of the similarity, if not identity, of the questions raised in the two cases, the cases are considered together.

At the outset it is necessary to dispose of a question raised by the *amici curiæ* in the *quo warranto* case as to the jurisdiction of the court to hear and determine some of the issues in that case. The ordinance of 1930 provides, among other things, that it shall not take effect (except for the purpose of submission to a vote of the people) until accepted in writing by the Chicago Local Transportation Company, the grantee therein named. The *amici curiæ* suggest that for this reason the information is premature, that the validity of the ordinance cannot be passed upon until it becomes effective, and that therefore the court has no

jurisdiction to decide at this time any of the questions raised except the one as to whether the Chicago Local Transportation Company is a validly organized corporation. A lengthy brief has been filed by the *amici curiæ,* arguing fully the jurisdictional question and arguing also the merits of the question as to the validity of the 1929 Corporation Act Amendment. The suggestions of the *amici curiæ* in that respect are, that the city has not, either in passing the ordinance of 1930 or otherwise, exercised any powers under the legislation of 1929, and that therefore *quo warranto* will not lie. The Quo Warranto act provides, among other things, that if "any corporation * * * exercises powers not conferred by law," the Attorney General or the State's attorney may, upon leave of court, file an information in the nature of *quo warranto* in the name of the people. A municipal corporation is a "corporation" within the meaning of this language in the Quo Warranto act, (*People* v. *Board of Education,* 101 Ill. 308; *People* v. *City of Peoria,* 166 id. 517;) and the solution of the jurisdictional question depends upon whether the record shows that the city of Chicago "has exercised powers" under the legislation of 1929.

The information charges, and the plea expressly admits, that the city has exercised, and is exercising, powers under the acts of 1929. The city's plea is one of justification. It not only admits the exercise of the powers but seeks to justify such exercise. The admissions in the city's plea, therefore, establish the city's exercise of powers under the acts of 1929. In the absence of a charge of collusion of the litigants, which is expressly disclaimed in the brief of the *amici curiæ,* the admissions made in the pleadings are sufficient to dispose of the claim that this action was prematurely instituted. Further, there can be no question but that the city by the overt act of passing the Comprehensive Traction ordinance exercised powers under the legislation of 1929. For instance, the city by this ordinance grants a terminable permit, which could be done only by

virtue of the Terminable Permit act of 1929. The city obligated itself by this ordinance to build two subways for use by the grantee, and the People contend that the necessary power exists, if at all, only by virtue of the Subway act of 1929.

It must be apparent the very passage of an ordinance such as this amounts to more than a mere claim or assertion of power by the city. It is an actual exercise of power, and the question whether such power exists can be raised as soon as the power is exercised. In *People* v. *Chicago Live Stock Exchange,* 170 Ill. 556, the respondent corporation had adopted a by-law prohibiting its members from employing trade solicitors who were not members of the exchange. It had not enforced, but had merely threatened to enforce, the by-law against its members. The question presented was whether *quo warranto* would lie, and the court decided that question in the affirmative. Here the record shows that the city, in addition to passing the ordinance of 1930, has spent, and is spending, money and doing acts to carry out the objects and provisions of the ordinance. By the ordinance the city exercised completely the power to grant a terminable permit under the legislation of 1929. The city's action in that respect is now complete. Nothing remains to be done by the city to make the grant effective. It is conceded by the *amici curiæ* that upon acceptance by the grantee the ordinance would constitute an exercise of power by the city which could be challenged by *quo warranto.* But such acceptance would be the act of the grantee and not of the city, and such an act by the grantee will not constitute an exercise of power by the city. This shows that the city's exercise of power occurred at the time it passed the ordinance. An analogous case is *Davis* v. *Mayor of New York,* 1 Duer, 451. There the city council had been enjoined from granting a street railway franchise to certain individuals. Despite the injunction the city council passed an ordinance granting such a franchise. The

ordinance provided that it should not take effect until accepted in writing by the grantees. In holding that the city council by the passage of the ordinance had exercised the powers which had been prohibited by the injunction, the Court of Appeals of New York said: "So in the present case, the common council, and a majority of its members, have done all they could do to render the grant they were forbidden to make, operative and effectual. They passed the resolution with the intent that it should operate as a grant and in the confident expectation that by its acceptance it would become such. If they meant otherwise they either should not have adopted the resolution at all, or, when they had passed it, should, as they might have done, have forbidden its acceptance. As the case stands they have made the grant which they were commanded absolutely to desist and refrain from making, and this grant, as they intended, by their permission and with their consent has become absolute. Hence, if words have a meaning or the law an intention, they have violated the injunction both in its letter and in its spirit, and, I am constrained to add, they meant to violate it and knew that they had done so."

The record in this case shows many important steps taken by the city, after passage of the ordinance, for the purpose of furthering its objects and provisions. These various acts leave little room for doubt that it had exercised, and was exercising, powers under the enabling legislation of 1929. Under these circumstances it seems clear that the People are entitled at this time and in this proceeding to challenge the authority of the city of Chicago to pass the Comprehensive Traction ordinance and also to challenge the validity of the enabling legislation of 1929.

The four so-called enabling acts of 1929 are challenged upon numerous grounds. Some of the grounds may be said to present questions which are fairly debatable, while others seem to have been raised for the sole purpose of presenting any and every question which could possibly be raised in a

case of this kind. The 1929 Corporation Act Amendment is challenged on the ground that its title is double, in that it amends the general Corporation act of 1919 by amending section 2 and also by adding a new section to be known as section 3½. An amendatory act may provide for amending more than one section of the original act and may include anything that might have been inserted in the original act. (*Gage* v. *City of Chicago,* 203 Ill. 26; *Morrison* v. *People,* 196 id. 454; *Maulding* v. *Skillet Fork Drainage District,* 313 id. 216.) There can be no doubt that the general Corporation act of 1919 could have provided for organization of corporations of the type authorized by the amendatory act of 1929, and so it was appropriate in the latter act to provide for such corporations by amending the original act.

It is also argued that the provisions of section 2 as amended and the new section 3½ are inconsistent with each other. Section 2 prohibits in general terms the organization of railroad corporations under this act, while section 3½ provides for organization of corporations for the operation of a local transportation system which may incidentally include a certain limited type of railroad properties. The two sections are not inconsistent, as section 2 expressly excepts from its prohibition corporations to be organized under section 3½. The title of this act is further attacked on the ground that it gives no intimation that the act creates a new metropolitan area. The act merely designates the territory in which the local transportation corporation is to conduct its business. The remaining attacks upon the title of this act may be answered by a mere statement of some of the well settled rules. The title of an act is not bad because it is couched in general language. (*People* v. *Nelson,* 133 Ill. 565.) It is the general subject, and not the subject matter, that is required to be expressed in the title. (*People* v. *Sayer,* 246 Ill. 382.) The title need not be either an abstract, a synopsis or an index of the contents of the act. *People* v. *McBride,* 234 Ill. 146.

It is next contended the act violates sections 9 to 15 of article 11 of the constitution of this State. The basis of this contention is the claim that those sections of the constitution provide a code of laws for the regulation of railroads, that corporations organized under the act of 1929 are railroad corporations, and that the act is invalid because it does not include, or in some instances makes provisions contrary to, the constitutional provisions, and that the constitution prohibits the legislature from creating a corporation to own and operate both street railways and local railroads. As affecting the powers of the legislature, the constitution is one of limitation and not one of delegation. Unless prohibited by the constitution the legislature has plenary power to enact such laws as it may see fit. (*Sutter* v. *People's Gas Light Co.* 284 Ill. 634; *People* v. *Baird,* 307 id. 503.) It must be presumed in favor of an act of the legislature that the latter considered the constitutionality of its action and determined that it was valid. (*People* v. *Joyce,* 246 Ill. 124.) The constitutional provisions in question do not, either expressly or by necessary implication, prohibit the legislature from creating corporations such as are provided for by section 3½ of the act. The cases of *Bradley Manf. Co.* v. *Traction Co.* 229 Ill. 170, and *Hartzell* v. *Traction Co.* 263 id. 205, are cited as holding that in this State a corporation cannot be organized to operate both street railways and commercial railroads. Those cases hold merely that under the statutes then in existence the legislature had not authorized the organization of such a corporation. This lack of legislation has now been supplied by the act of 1929, and the two decisions cited have no bearing upon the question here involved.

The facts agreed upon by the parties show that when the constitution of 1870 was adopted there were two classes of railroads or railways. One class consisted of steam trunk line railroads, and the other consisted of railroads or railways engaged only in local transportation. The word

"railroad" was usually applied to the first class and the word "railway" to the second class, but these terms were frequently used interchangeably as applying to steam trunk line railroads and street railways. Our constitution uses the words somewhat interchangeably. Section 4 of article 11 uses the words "street railroad" in referring to a street railway engaged in local transportation within the limits of a city or village, (*Venner* v. *Chicago City Railway Co.* 258 Ill. 523,) while section 12, which clearly applies only to steam trunk line railroads, uses the word "railways." A careful study of sections 9 to 15 of article 11 discloses that the words "railroad" and "railroad corporations" as there used were intended to apply only to steam trunk line railroads and not to railroads or railways engaged in purely local transportation. (*Venner* v. *Chicago City Railway Co. supra; Gyger* v. *Philadelphia City Passenger Railway Co. Appeal of Montgomery,* 136 Pa. St. 96, 20 Atl. 399.) But even if it appeared that the 1929 Corporation Act Amendment provided for the organization of corporations which could be said to be railroad corporations within the meaning of the constitutional provisions, the act would not be invalid merely because it did not expressly embody those provisions. The provisions of sections 9 to 15 are in the main self-executing, (1 Cooley's Const. Lim. (8th ed.) pp. 167-170; *Ogren* v. *Rockford Star Printing Co.* 288 Ill. 405;) and by virtue of the inherent power of the constitution itself such provisions are engrafted upon every law relating to the organization of corporations of the kind therein referred to. (*Dupee* v. *Swigert,* 127 Ill. 494.) In any event, it was unnecessary for the legislature to include in the act of 1929 any of the provisions of sections 9 to 15 of article 11 of the constitution. Even if it appeared that the legislature had enacted provisions which were directly in conflict with constitutional provisions on the same subject, this would not destroy the entire act but would render invalid only those portions which conflicted with the constitution unless they were integral parts of the act.

The objection that the 1929 Corporation Act Amendment grants the right to construct and operate a street railway within cities without requiring the consent of the local authorities having control of the streets, in violation of section 4 of article 11 of the constitution, is equally unfounded. Paragraph 5 of section 3½ of the act expressly provides that the act shall not be construed as authorizing the construction or operation of a street railway when the constitution or any law of this State requires the consent of the local authorities, unless such consent shall have been first obtained.

It is next contended that this act amends various other acts, including the so-called general Railroad act and the acts relating to listing and valuation of railroad property for taxation, without referring to such laws either in the title or the body of the act, in violation of section 13 of article 4 of the constitution, which provides that "no law shall be revived or amended by reference to its title only, but the law revived, or the section amended, shall be inserted at length in the new act." The purpose and application of this provision have been considered many times. It was adopted to put an end to the vicious practice which had previously obtained, of expressly amending prior acts by reference only to their titles. This provision does not have the effect of rendering invalid an act merely because it may amend or affect other acts by implication. (*People* v. *Crossley,* 261 Ill. 78; *People* v. *Stitt,* 280 id. 553; *Holmgren* v. *City of Moline,* 269 id. 248; *Broder* v. *Krenn,* 334 id. 256.) The general Corporation act as amended by the act of 1929 is complete in itself. The new section 3½ added by the 1929 act in using the word "railroad" does not amend or purport to amend any other act by implication. There is certainly no express reference to or amendment of any act other than the general Corporation act. Even if the 1929 amendment were to be construed as amending earlier acts by implication this would not render it obnoxious to the constitutional provision. In *Timm* v. *Har-*

*rison,* 109 Ill. 593, the court quoted with approval the following language of Mr. Justice Cooley in *People* v. *Mahaney,* 13 Mich. 481 : "If, whenever a new statute is passed, it is necessary that all prior statutes modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be re-published at every session, and parts of it several times over, until from mere immensity of material it would be impossible to tell what the law was."

It is further claimed that the rules announced in the cases above cited have no application where the act challenged is in terms an amending act, and that since the 1929 act expressly amends the general Corporation act it is necessarily invalid if it amends any other act by implication. The general Corporation act as amended by the act of 1929 is clearly complete in itself, and neither it nor the amendment of 1929 is invalid even if other acts are thereby amended by implication. (*Holmgren* v. *City of Moline, supra; Steinhagen* v. *Trull,* 320 Ill. 382.) In the latter case an act of 1923 expressly amended paragraph 4 of section 1 of the Statute of Descent. It also amended by implication section 1 of the Dower act, but was nevertheless held valid. Section 3½, which is added by the amendatory act of 1929, does not amend any other provision or section (except section 2) of the general Corporation act. It is an independent section, aptly designed to provide for the organization of a separate class of corporations—a particular kind of local transportation company. It confers upon such corporations powers deemed by the legislature to be appropriate and necessary, and does not extend those powers to, or detract from the powers granted by other sections to, other corporations organized under the general act.

It is further argued that the 1929 Corporation Act Amendment is a local or special law, in violation of section 22 of article 4 of the constitution. In support of this

contention it is said that the act is not based upon a reasonable classification; that it applies only to Chicago and its metropolitan area, discriminates against steam trunk line railroads, discriminates in favor of cities and against villages, and creates a monopoly. This court has frequently considered questions of this kind, and no good purpose would be served by referring to the many decisions dealing with them. The following rules have been established by a long line of decisions in this State: Whether a law is general, local or special does not depend upon the number of things within the scope of its operation. An act is general not because it operates in every place or upon every person in the State but because every place or person brought within the relations or circumstances provided for is affected by the law. An act is not local or special merely because it operates in but one place or upon a particular class of persons or things, provided there is a reasonable basis for the legislative classification. A law may be general notwithstanding the fact that it may operate in only a single place where the condition necessary to its operation exists. *Mathews* v. *City of Chicago*, 342 Ill. 120.

The Corporation Act Amendment of 1929 is general in its terms and in its operation upon all persons and subject matter in this State in like situation. It provides that "corporations may be organized hereunder" for the purpose of operating a unified local transportation system in, and in the vicinity of, any city having a population of 500,000 or more. In this respect it is unlike the cases considered in *Frye* v. *Partridge*, 82 Ill. 267, and *People* v. *Rinaker*, 252 id. 266. In the *Frye case* the act provided for establishing a single ferry at a single place in this State, and the court there said: "It is not only limited in its application to one ferry, but that one is located at a definite place." In the *Rinaker case* the act provided that only one forest preserve district should be organized in any one county but did not require such district to embrace a forest, so that once a

district should be organized in one county, no matter how small the territory embraced within that district or how many forests the county might contain, no other district could ever be organized in the same county. Neither of the acts involved in those cases attempted to make a classification and they were both strictly local or special. Here, on the other hand, the act is general. Any number of corporations may be organized under it, and the act applies to all places in the State where the conditions which are prescribed in the act exist now or may hereafter exist. The conditions so prescribed in the act are founded upon a reasonable basis in fact, as is shown by all the facts and circumstances agreed upon by the parties. The classification based upon population has a reasonable relation to the purposes and objects of the legislation and is based upon a rational difference of situation and conditions found in cities of 500,000 or more inhabitants. This court has recognized that traffic and transportation conditions in larger cities require special consideration and treatment. (*People v. Kastings,* 307 Ill. 92; *Weksler v. Collins,* 317 id. 132.) The act is none the less a general one merely because it is applicable at present only to the conditions existing in one city. *Mathews v. City of Chicago, supra; Martens v. Brady,* 264 Ill. 178.

It is also argued that the act is invalid because it does not authorize local transportation corporations organized thereunder to acquire and operate railroads constituting or used as a part of a steam trunk line railroad system operated as a common carrier of freight and passengers. What powers the new local transportation companies were to have and what property they were to own and operate were matters solely of legislative policy, provided no constitutional provision was violated. It was for the legislature to determine whether such corporations should be empowered to acquire and operate railroad properties generally, or railroad or railway properties of a limited type most suitable to the

nature of the corporations. It is no objection to an act for the organization of corporations that it limits the powers or sphere of action of such corporations. The facts agreed upon by the parties demonstrate the basis for the factual distinctions between the two forms of transportation, the commercial steam trunk line railroads and local transportation companies operating electric railways or railroads chiefly, if not exclusively, as carriers of passengers in metropolitan areas. There is nothing in this act which discriminates against steam trunk line railroads or in favor of electric trunk line railroads. The act confers no powers upon either. It confers power only upon the new type of corporations organized for purposes of local transportation, and so far as it empowers those corporations to purchase or operate one type of property and not another and different type the act is not subject to objection.

Nor is the act invalid as discriminating in favor of cities and against other forms of municipal corporations. Section 3½ provides for the organization of corporations to furnish local transportation service to the inhabitants of "any city in this State" having a population of 500,000 or more and for the adjacent and suburban territory called the "metropolitan area." It is argued that under this act no such corporation could be organized to serve the inhabitants of a village or incorporated town even though the requisite condition as to population should exist. But the rule is well settled that the word "city," as used in the statute, is to be construed as including villages and incorporated towns unless the act indicates a legislative intention to the contrary. (*Burke* v. *Monroe County,* 77 Ill. 610; *People* v. *Grover,* 258 id. 124; *People* v. *Kesner,* 321 id. 230.) There is nothing in this act to indicate that the legislature intended to discriminate in favor of cities, and under the rule announced in those cases it must be held that the act applies not only to cities but also to other forms of municipal corporations.

It is also contended that the act creates a monopoly, in that only one unified local transportation company will be permitted to operate in each city of 500,000 inhabitants and the metropolitan area. There is, however, no limit to the number of corporations which may be organized under the act, and so the act does not in any sense create a monopoly. If a monopoly in local transportation is created it will not be by virtue of the 1929 act but by virtue of a subsequent municipal grant of street rights to a single corporation. Even a municipal grant of street rights would not create a monopoly unless it was exclusive in character, and the statute would not be rendered invalid by reason of a subsequent grant by a municipal corporation of exclusive street rights to a corporation organized under the act. But in any event, even if the act of 1929 could be said to foster a monopoly in one company doing a local transportation business in a given metropolitan area, it would not necessarily be invalid. While the public policy of this State formerly encouraged competition among public utility companies and forbade monopolies, it is now recognized by the State that under proper regulations a monopoly in this field is preferable to unrestricted competition, and an act which permits such a monopoly is free from constitutional objections. (*Public Utilities Com.* v. *Romberg,* 275 Ill. 432.) The legislature has in the Public Utilities act declared the public policy of this State to be in favor of regulated monopolies in the local public utility field. The Commerce Commission of this State has ample power to decide whether one or several companies engaged in furnishing public utility service shall operate in the same locality. A corporation organized under the 1929 Corporation Act Amendment is not, therefore, assured of a monopoly in any given field, since the Commerce Commission has power, under the circumstances and within the limits fixed in the Public Utilities act, to permit one or more corporations to engage in the same business in the same locality.

It is further argued that the 1929 Corporation Act Amendment is a special law, in violation of section 1 of article 11 of the constitution, which provides that "no corporation shall be created by special laws * * * but the General Assembly shall provide, by general laws, for the organization of all corporations hereafter to be created." The argument here seems to be that as a practical matter only one corporation can ever be organized under the 1929 act to conduct a unified local transportation system in a given locality. There is nothing in the act limiting the number of corporations which may be organized under its provisions, and, as indicated above, the act is general and not special in any sense.

Careful consideration has been given to all the objections urged against the 1929 Corporation Act Amendment. Although all of the minor points and contentions used in the argument have not been discussed, the major contentions have been dealt with and are clearly unfounded.

The so-called 1929 Railroad act is attacked principally on the ground that its title is defective, as giving no notice of the contents of the act. The title is, "An act to enlarge the powers of railroad companies," and the body of the act authorizes railroad companies to lease, sell, transfer and convey all or a part of their properties to any other company organized under the laws of this State having power to purchase or lease such property. The title is broad enough to cover everything contained in the body of the act. It is not a valid objection that the title is too broad, for the legislature must itself determine how broad and comprehensive shall be the object of a statute and how much particularity shall be employed in defining it. (*Sutter* v. *People's Gas Light Co. supra; People* v. *People's Gas Light Co.* 205 Ill. 482.) It is urged that this act amends other acts and is therefore invalid. The act is complete in itself and does not expressly amend or purport to amend any other act, and, as shown above, even if the act did

amend other acts by implication it would not be invalid for that reason. Nor can it be said that the act violates section 11 of article 11 of the constitution because it does not expressly provide that a railroad shall not sell its property to a competing railroad. On the contrary, the act expressly provides that sales or leases shall be made only to corporations "having power to purchase or lease the same," thus making it clear that a competing railroad or one owning parallel lines could not acquire railroad properties by purchase or lease under this act.

Other objections are urged against this act, but inasmuch as substantially the same arguments were made and have been disposed of with respect to the 1929 Corporation Act Amendment it is not necessary to deal with them here. The 1929 Railroad act is not subject to any of the objections which have been urged against it.

The so-called Terminable Permit act is attacked upon the ground that its title is bad, that the act constitutes an irrevocable grant of a franchise, that it is a local or special law, that the franchise is not subject to forfeiture, and that the act provides for a donation or lending of the city's credit, in violation of the constitution. These objections will be considered in their order.

The title of this act is, "An act conferring powers upon municipalities to grant terminable permits to construct, reconstruct and/or maintain and operate street railways, railroads and/or public utility motor vehicles, or a unified local transportation system comprising both street railways and railroads, and which may also comprise public utility motor vehicles and/or any other local public utility transportation facilities, the major portion of which street railways, railroads, public utility motor vehicles, and/or other local public utility transportation facilities is or is to be located within, or the major portion of the service of which is or is to be supplied to the inhabitants of such municipality." The title is attacked on the ground that it conceals the fact that

the body of the act provides for a perpetual rather than a terminable permit since it does not expressly provide for forfeiture of the franchise for misuser. References were made to the report of an investigation made by a committee of the Illinois legislature in 1927 as showing the understanding of the members that the term "terminable permit" means a permit which lasts only during the good behavior of the grantee and is subject to termination or forfeiture by the municipality for misuser. This report shows, at most, that the members of the committee considered that a provision for termination should be included in an act providing for grants of terminable permits. Both the title and the body of the act refer to permits which are terminable. While the title does not state how the permits may be terminated, this was unnecessary. The body of the act provides for grants without limitation as to duration but subject to termination by purchase of the properties of the grantee by the municipality or its nominee, and expressly provides that "every such grant shall be known as a 'terminable permit.' " It also provides that such terminable permits may contain such other terms and conditions as the municipality may decide, provided, only, that such terms shall not be contrary to or inconsistent with this act or with the powers of the State to regulate public utilities. The words "terminable permit" have not acquired a fixed or settled meaning so that it may be said they necessarily refer to permits which must be terminable for misuser. It was proper for the legislature to define, as it does in this act, what meaning it chose to give its words. The rule is well settled that if the words used in the title of an act, when taken in any sense or meaning which they will bear, are sufficient to cover the provisions of the act, the act will be sustained though the meaning so given the words may not be the most obvious or common. (1 Lewis' Sutherland on Stat. Const. (2d ed.) sec. 127; *State* v. *Board of Control of State Institutions,* 85 Minn. 165, 88 N. W. 533; *Affholder* v. *State,* 51 Neb. 91, 70

N. W. 544.) It is conceded to be the rule that grants of street franchises to public utility companies are subject to the implied condition that they may be terminated for misuser or non-user. (*New York Elevated Lines* v. *Empire City Subway Co.* 235 U. S. 179; *People* v. *Central Union Telephone Co.* 232 Ill. 260.) It therefore follows that if the words "terminable permit" as used in the title necessarily referred to grants which would be terminable for misuser, it was unnecessary for the legislature in the body of the act to expressly provide a condition for termination which was implied in every such grant.

It is next contended that the act makes an irrevocable grant of special privileges or immunities, in violation of section 14 of article 11 of the constitution. What has been said above is sufficient to show that the permits granted under this act are not irrevocable, and, in any event, they are not grants of special privileges or immunities within the meaning of the constitutional provision. Nor is the act a local or special law granting a special or exclusive privilege or franchise within the meaning of section 22 of article 4 of the constitution. Both in its terms and application it is a general law. It is also said that the act abridges the legislative power and right of eminent domain and precludes forfeiture of the property and franchises of the grantee of a terminable permit, in violation of sections 14 and 15 of article 11 of the constitution. The objections here seem to be based upon the erroneous assumption that a permit granted under the act will be perpetual, and are clearly without merit.

It is further argued that this act, if considered as authorizing the grant of a permit for use of municipally owned subways, would violate separate section 2 of the constitution, which forbids every municipal corporation to "make donation to or loan its credit in aid of" any railroad or private corporation. This act, however, makes no grant of any kind to or in aid of any private corporation, nor

does it authorize a municipal corporation to make any such grant. Whether the terminable permit embodied in the Comprehensive Traction ordinance violates this provision of the constitution will be subsequently considered.

A further attack upon the validity of this act is that it is a special act, in violation of section 1 of article 11 of the constitution. A sufficient answer to this contention is, that the Terminable Permit act does not create any corporation nor extend, change or amend the charter of any private corporation. It simply authorizes municipal corporations to grant permits. It is general in scope and applies to all municipalities coming within its provisions.

The act is further opposed because it is said to be a grant of a perpetual franchise. It is said that while the act makes the permit terminable upon purchase of the property by the municipality, the possibility of such termination is illusory because municipalities in this State have no power to acquire such properties, particularly where they are located in and serve an entire metropolitan area embracing the territory of many separate municipal corporations, and that in any event the city of Chicago will never be able to acquire the local transportation properties used to serve its inhabitants because it will never be able to provide funds for the payment of the purchase price. The Terminable Permit act is to be considered in the light of the 1929 Corporation Act Amendment, which was approved on the same day. The latter authorizes the organization of corporations to acquire and operate unified local transportation systems, the major portion of which, or the major portion of the service of which, is or is to be furnished to the inhabitants of any city in this State having a population of 500,000 or more and the metropolitan area as therein designated. The Terminable Permit act authorizes every municipality to grant terminable permits for construction and operation of a unified system of local transportation, the major portion of which is or is to be located within,

or the major portion of the service of which is or is to be supplied to the inhabitants of, such municipality, and the act expressly provides that every such permit shall reserve to the municipality the right or option to purchase such properties. Although the Terminable Permit act does not expressly grant power to the municipalities to purchase such properties, it necessarily implies that they had, or should by virtue of this act have, such power. It is unnecessary to decide whether the Terminable Permit act itself grants such power to municipalities. It at least recognizes that such power exists, for otherwise the legislature, by requiring each permit to contain a reservation as to municipal purchase, would have been doing a useless thing. In making that requirement the legislature no doubt had in mind the provisions of the Municipal Ownership act. (Smith's Stat. 1931, chap. 111⅔, p. 2281.) That act authorizes municipalities to acquire and operate any public utility "the product or service of which, or a major portion thereof, is or is to be supplied to the city or its inhabitants," etc. That act does not limit the properties to be purchased by municipalities to such as are located within the municipality, but by the quoted language indicates clearly that if a major portion of the properties is located within, or if the major portion of the service is or is to be supplied to, the municipality, the latter may acquire and operate the properties. The legislature has sufficiently expressed its intention to authorize municipalities to purchase and operate such properties even though a large portion thereof is located outside the municipality. To hold otherwise would be to thwart the manifest intention of the legislature.

The further objection that the city of Chicago is not, and will not in the near future be, financially able to purchase the property in question, and that therefore the grant of a terminable permit will be in effect perpetual, even if well founded would not affect the validity of the act. As said before, the act is general and applies to all municipali-

ties. It authorizes them to reserve the option to purchase in making every such grant, regardless of the size and value of the properties. The act is not rendered invalid merely because at the present time all municipalities may not be financially able to purchase all the properties involved in the grants of terminable permits. Although the finances of the city of Chicago at the present time may not be such that the city could purchase the properties in question, there is and could be nothing to indicate that this condition will continue forever and that the city's grant of a terminable permit will, in fact, prove to be perpetual.

Due weight has been given to all the objections raised against the validity of the Terminable Permit act, and our conclusion is that the act is valid.

The Subway act is attacked first upon the ground that its title is not broad enough to cover the subject of the act, and that the title refers to the authority of municipalities to construct or acquire and "operate or lease" subways, whereas section 5 of the act authorizes municipalities to "lease, consent to, permit or grant the use of such subways." The argument is that the title relates to the single subject of a "lease," while the body of the act refers to two subjects, viz., "lease" and "permit." The title of the act is not required to contain every term used within the body, for otherwise the title would in each case be as long as the act itself. All that is necessary is that the title indicate the general subject of the act. The word "lease" as used in the title is broad enough to include any grant of a permissive use. A lease always includes the element of a permissive use of property by the lessee, and it makes no difference what term is used to describe that permission. *Barsaloux* v. *City of Chicago,* 245 Ill. 598, involved an ordinance by which the city permitted certain traction companies to use subways of the city. Although the traction companies were to contribute a large amount to the city toward the cost of constructing the subways, this court there held that "the relation of the

city and the traction companies, in so far as the subways are concerned, would be that of lessor and lessee." The objection to the title of this act is without merit.

It is further contended that the Subway act violates separate section 2 of the constitution, referred to above, which forbids every municipal corporation "to make donation to or loan its credit in aid of" railroads, etc. A careful study of this act fails to disclose any provision which could in any way be construed as authorizing a municipality to donate or loan its credit in aid of any corporation. The mere fact that the city is to build the subways at its own cost or by special assessment and is authorized to permit them to be used by local transportation companies does not in any way violate the constitutional provision referred to. The city is to permit such use "upon such terms and conditions as the city council of the city by ordinance shall prescribe." Whether or not such an ordinance, when passed, constitutes a donation or lending of its credit by the city is a question which has no bearing upon the validity of the act.

In the *Bass case* (No. 21019) a further question is raised as to the validity of the so-called Transit Commission act, approved June 19, 1929, entitled "An act to amend an act entitled 'An act concerning public utilities,' approved June 29, 1921." (Laws of 1929, p. 581; Cahill's Stat. 1931, chap. 111a, art. 6a.) This act provides for the creation and establishment of a local transit commission in cities having a population of 500,000 or more whenever the council of any such city "shall pass and there shall become operative and effective an ordinance granting consent, permission and authority for the establishment, maintenance and operation of a comprehensive unified local transportation system," etc. The condition or event upon which the creation and establishment of a local transit commission is made to depend has not occurred, and the question of the validity of the act is therefore premature at this time.

Aside from this, however, it is urged that the Transit Commission act is unconstitutional because it denies due process of law to the inhabitants of the metropolitan area outside the corporate limits of Chicago, in violation of section 2 of article 2 of the constitution. But the municipalities in the metropolitan area will have the same powers and rights under the transit commission as they would have if the Illinois Commerce Commission, or any other commission, had been created by the legislature to exercise the regulatory powers granted. The legislature has seen fit to place the public utility in question under the supervision of the transit commission rather than burden the Illinois Commerce Commission with additional duties. There is nothing in the constitution which prohibits the legislature from creating more than one commission of this character, nor does the creation of such commission violate the due process clause of the constitution. Neither does the appointment of the members of the transit commission by the mayor of Chicago conflict with any statute or constitutional provision. This provision was one wherein the legislature exercised its discretion, just as it had previously provided that the Governor should appoint the members of the Illinois Commerce Commission. Under the provisions of the Transit Commission act no municipality or territory within the thirty-mile metropolitan area will be brought within the act unless there exists in such municipality or territory local public utility transportation facilities operated mainly in the transportation of persons, the major portion of which facilities are located within, or the major portion of the service is to be supplied to the inhabitants of, the metropolitan city. So long as Chicago's local transportation system does not extend to Joliet or other cities within the thirty-mile area, the transit commission will have no regulatory powers over the system within such cities. When Chicago's local transportation system does extend to these other cities, then the jurisdiction of the transit commission will only extend to such

facilities as may then be a part of Chicago's local transportation system and no further. This provision for the regulation of a complex transportation system in the second largest metropolitan district in the United States does not deprive the citizens of the territory in the metropolitan area outside of Chicago of any rights, as such regulatory power must be vested somewhere. The transit commission, when appointed, will not be the creature of the city of Chicago but will be created by virtue of authority granted by the legislature of the State of Illinois, acting well within its authority.

Other objections to the Transit Commission act are equally unfounded. It cannot be said that the Transit Commission act violates section 22 of article 4 of the constitution of this State, forbidding the passage of local or special laws. The classification of the act is necessarily based on population. The charters of municipalities in the metropolitan area are not amended, nor is there anything in the act which is inconsistent with the provisions of article 6 of the Public Utilities act, (Cahill's Stat. 1931, chap. 111a, pars. 100-105,) granting home rule to cities.

There remains for consideration the validity of the Comprehensive Traction ordinance. So far as it has been attacked on the basis of the invalidity of the enabling legislation above referred to, the attack must fail. Numerous other questions are raised, however, concerning the validity of the ordinance. It is first contended that upon its acceptance by the grantee the ordinance will obligate the city to build subways at a cost of approximately $85,000,000, and that the city will therefore incur an indebtedness in excess of the debt limit fixed in section 12 of article 9 of the constitution. The indebtedness is said to be created by paragraph (a) of section 9 of the ordinance, which provides that during the first ten years immediately following the effective date of the ordinance "the city agrees, pursuant to the powers conferred upon it by law, to construct or

acquire the subways, * * * and the city further agrees that after the effective date hereof it will proceed to construct or acquire such subways with all due diligence consistent with its ability to meet the cost thereof out of any funds raised by such special assessments as the city may deem necessary or proper and/or out of the city transit trust fund." This paragraph contains a proviso as follows: "It is understood, however, that nothing in this ordinance contained shall be deemed to impose any obligation upon the city to raise funds to meet such cost or any part thereof by general taxation."

The ordinance has not yet been accepted by the grantee, but when accepted it will constitute a contract between the city and the grantee. Where the grant of a franchise to a public utility corporation is susceptible of two constructions, that construction will be adopted which is most favorable to the public. (*Blair* v. *City of Chicago,* 201 U. S. 400.) The provisions above quoted from the ordinance do not create any indebtedness. In limiting the obligation of the city to the exercise of "the powers conferred upon it by law," it was the evident intention of the city to avoid obligating itself to become indebted to any extent in excess of the limit fixed by the constitution. This interpretation is further aided by reference to the proviso above quoted, by which the city council disclaimed any obligation to raise funds for construction of the subways by general taxation. The ordinance merely expresses the purpose and agreement of the city to build the subways so far as it may have lawful authority to raise the necessary funds. An expression of such a future purpose is not the incurring of any present or future debt. (*Jacksonville Railway Co.* v. *City of Jacksonville,* 114 Ill. 562.) This ordinance, when accepted, will not create an indebtedness in excess of the city's debt limit, contrary to the provisions of the constitution.

It is argued, however, that even though the city's debt limit be not exceeded, section 9 of the ordinance violates the

second of the separate sections of the constitution, in that the city thereby makes a donation to or lends its credit in aid of the grantee named in the ordinance. This contention is based upon the provisions relating to the compensation to be paid by the grantee to the city for use of the subways. The ordinance provides that the city shall receive as such compensation three per cent of the annual gross receipts of the company, which three per cent shall be cumulative but shall be junior to operating expenses, including rentals for leased properties, taxes and obligations of the company paid and accrued for each fiscal year, and junior also to the following: Interest and sinking fund requirements on the company's bonded indebtedness, and dividends on a limited portion of the company's preferred stock, the interest, sinking fund and additional requirements being made cumulative and payable in full prior to payment of the three per cent of the gross receipts to the city. A calculation is made by appellants to show that on the basis of the combined operations of the local street railway companies for the years 1929 and 1930 the city would obtain less than the agreed three per cent, or perhaps nothing, for its compensation for those years and less than the three per cent in 1931. Appellants draw the conclusion that even if the city obtains annually three per cent of the gross receipts, and certainly if in any year it obtains less, the ordinance will constitute a donation to or lending of the city's credit to the grantee under the ordinance.

In *Chicago General Railway Co.* v. *City of Chicago,* 176 Ill. 253, in dealing with the rights and duties of a city in granting the use of its streets to a street railway company, this court said: "If, in the exercise of its sound discretion, the city council shall determine that the best interests of the public do not require the imposition of any conditions whatever, it may grant its license without qualification; but if, on the other hand, the public interest requires that the occupancy of particular streets, under peculiar conditions, de-

mands that certain exactions shall be made of the company for the privilege conferred, then the city council has a right to so provide, and no constitutional right or privilege is interfered with." By the Subway act the legislature has in section 5 expressly authorized the city to lease, permit or grant the use of its subways for transportation purposes "upon such terms and conditions as the city council of the city by ordinance shall prescribe." The amount of compensation to be paid to the city and the time and manner of its payment are thus left to be determined by the city council. Whether or not the city has made a bad bargain is not a question to be decided by a court. It has provided for the payment of compensation for use of its subways, and while it seems possible that under present conditions the city would not immediately receive in full the three per cent of the company's gross receipts, it cannot be predicted that this will necessarily be so at the time when the ordinance is accepted or in the ensuing years. Because of the impossibility of predicting now what the company's gross receipts in the future will be and how much the city will obtain therefrom for use of its subways, it cannot be said that the agreed compensation will be less than a fair return to the city upon its investment. However, as stated above, the amount of the compensation to be exacted by the city is not a judicial question in the absence of a showing that it will be so low as to amount to a subterfuge for the purpose of circumventing the provisions of the constitution. The mere fact that payment of the city's compensation is postponed or made junior to the other payments does not establish that the transaction amounts to a gift or a loan of credit. This question was passed upon in *Admiral Realty Co.* v. *City of New York*, 206 N. Y. 110, 99 N. E. 241. There an ordinance contract of the city was attacked on the ground that it constituted a gift or a lending of the city's credit to a private corporation, in violation of section 8 of article 10 of the New York constitution, which

was substantially like separate section 2 of our constitution. The city had agreed to construct subways and lease them to a transportation company for operation by the latter with privately owned lines. The proceeds of the operations were to be distributed in the following order: (1) Operating expenses; (2) a stated sum to the company equivalent to yearly earnings; (3) principal and interest on construction expenses of the company; (4) payment to the city for its investment (to be cumulative); and (5) division of the remainder between the city and the company. In holding the contract valid the court said: "The provisions which are especially pointed at by the appellants as obnoxious to the constitution and as infecting the entire contracts with illegality are those providing for the so-called preferential payments to the operating companies from the joint earnings of the new subways and the roads to be operated with them, respectively, before the city secures any returns. * * * The city constructs and leases its subways to the company for a consideration or rental to be paid from the net earnings, and it affords to its lessee an opportunity to derive profit from the lease by receipt of a like share of such earnings. There is no gift or loan in this but an ordinary contract for a consideration just as valid in the case of a municipality as in the case of an individual."

A contrary decision of this question was made in *State v. Cincinnati Street Railway Co.* 97 Ohio St. 283, 119 N. E. 735. That decision seems to have been based upon the assumption that the city was required to exact a money compensation from the company which should be definitely payable to the city each year, and which, if not then actually paid, would constitute, in effect, a loan of that sum to the company. In this State it has never been held that the city is required to exact a money compensation for use of its streets or subways. Under the Comprehensive Traction ordinance certain sums as they are earned are to be deposited with a trustee for purposes in which the city has an

interest. If they are not earned the city has no compensation to which it is then entitled. Under this ordinance there will never be a sum of money actually due the city which is withheld and applied to the obligations of the grantee company, as suggested in the Ohio case, and for this reason it is impossible to say that the preferential payment plan provided by the ordinance violates separate section 2 of our constitution, even if it were to be conceded that the reasoning of the Ohio case is sound.

In *Murphy* v. *Dever*, 320 Ill. 186, it was held that the city of Chicago had no authority to issue bonds for elevating the tracks of a railroad company under an arrangement whereby the city was to be later reimbursed by the company and the tracks were to be the private property of the railroad company. That decision was based upon the fact that the railroad company and not the city was to own the improvements, and it was expressly pointed out that a different situation would exist where the city itself owns the property to be improved and owns the improvements when completed. Under this ordinance the subways are to be constructed in the streets of the city and title to the subways will be and remain in the city. Under the circumstances of this case the permit granted by the ordinance to the transportation company does not constitute a donation or lending of the city's credit.

It is also urged that the ordinance is invalid because paragraph (*d*) of section 9 authorizes the grantee to permit the use of its tracks in the city-owned subways to any company having the right on August 31, 1929, to operate over the tracks of the railway companies whose properties are to be acquired by the grantee under the ordinance. The contention is that by this provision an interurban railroad, the Chicago North Shore and Milwaukee Railroad Company, commonly known as the North Shore Line, may be permitted by the grantee named in the ordinance to use the

tracks in the subways. The North Shore Line is now operating its cars over certain of the elevated lines in the city under an operating agreement which was authorized by order of the Illinois Commerce Commission. That order was sustained in *Chicago North Shore and Milwaukee Railroad Co.* v. *City of Chicago*, 331 Ill. 360, as being within the powers and jurisdiction of the commission. The ordinance does nothing more than to give the city's permission to do what the company could do in any event upon securing the consent of the Illinois Commerce Commission. The city gives whatever consent and authority it may lawfully give, and the entire matter remains under the control of the Illinois Commerce Commission or other similar regulatory body. The ordinance provides for the possible future removal of the whole or parts of the elevated structures covered by the operating agreement above referred to. It also recognizes that there may be surplus capacity in the subways which may be available for use for this interurban service and that the public interest will be subserved by permitting such use, subject to the provision, however, that such use shall not interfere with the local passenger service of the grantee. A further argument of appellants in this connection is that the city will have no control over or receive any compensation for such use of its subways by the North Shore Line. The ordinance, when accepted, will constitute a contract between the grantee and the city. The city's consent to the use of its subways by the grantee or the North Shore Line, as contemplated by paragraph (*d*) of section 9 of the ordinance, is compensated for by the grantee's undertakings, one of which relates to the payment of three per cent of its gross revenues. This payment will, of course, include any and all compensation received by the grantee from the North Shore Line for use of the subways. In any event, the undertakings of the grantee in the ordinance constitute the considerations moving to the city for all the latter's undertakings or consents.

Section 9 of the ordinance permits the use of the city's traction fund for the construction of the subways. That fund represents the city's share of the earnings of the street railway companies paid to and accumulated by the city under the provisions of the ordinances of 1907. The purpose and effect of those ordinances were considered in *Barsaloux* v. *City of Chicago, supra,* and it was held that the city had power to acquire or construct elevated, surface or underground railways and to expend for such purpose either the special traction fund or any other available corporate funds of the city. That case answers the contentions of appellants in these cases. The Subway act, by section 4, also expressly authorizes the use of any special fund accumulated from moneys received by the city from street railway companies, for the cost of building city-owned subways. The proposed use of the city's traction fund as provided for in the Comprehensive Traction ordinance is a valid one.

Section 21 of the ordinance provides for the transfer of the city's traction fund to a bank or trust company as a trustee, and for payment to the trustee by the grantee under the ordinance of the three per cent of the company's gross receipts as defined in the ordinance. It provides that any sums not invested as specified in the ordinance may be deposited with certain depositaries. It also provides that the trustee of the fund may invest the fund in certain securities, including bonds of the grantee company purchased in the open market, and in the event all outstanding bonds shall have been acquired by the trustee, then in the debentures or preferred stocks of the grantee. It also provides that upon order of the city council the trustee shall cancel any securities of the grantee company held by the trustee in the fund and for reducing the capital value of the company by the principal amount of the securities so canceled. It is contended by appellants that these provisions are invalid. Their contentions are based upon the assump-

tion that the moneys to be transferred to the trustee and invested by it under this ordinance are the same as the usual revenues of the city which are collectible by the city collector or the city treasurer, and the statutes relating to collection, disbursement or investment of the city's ordinary funds are referred to as prohibiting the arrangement provided for in the ordinance. Section 1 of the Terminable Permit act authorizes any municipality to include in an ordinance passed pursuant thereto, "any other terms and conditions (including, but not limited to reasonable provisions for specified extensions and additions to lines and facilities, the retirement of investment by amortization or otherwise, or for compensation for the use of public property computed either by some proportion of the receipts from the operation of the property of the grantee, or otherwise) not contrary to or inconsistent with this act or with the lawful exercise of the power of the State to regulate public utilities." The provisions of the ordinance were justified by the terms of the Terminable Permit act. The compensation provided to be made by the grantee out of its gross receipts is not collectible by the city collector or the city treasurer. Until payment is made to the trustee the compensation is money in the hands of the grantee company which it cannot be compelled to pay except in the manner and for the purposes provided for in the ordinance. It is a fund in the hands of a trustee, to be held upon the trusts fixed by the ordinance. The city had power to agree with the grantee upon what provisions should be made for payment of the compensation, and the plan provided by the ordinance is a valid one. The city also had power to transfer the traction fund to the city transit trust fund, as provided in section 21 of the ordinance, such fund to be used in the construction of State street subway, as stipulated. The purposes of the trust are purposes for which the city traction fund can properly be expended under the provisions of the ordinance of 1907, and the transfer of the city

traction fund to the city transit fund as provided by the present ordinance is valid.

It is further argued that the provisions of section 21 of the ordinance as to investments of the city transit trust fund are invalid because contrary to statutory provisions concerning the investment of ordinary city funds. As above shown, the ordinance provides for the investment of moneys in a trust fund thereby created and not of municipal revenues in the hands of the city treasurer. This ordinance does not provide for any investments in securities to be held by or for the city. It simply provides the terms of a trust into which the grantee company will pay funds to be used in the interests of both the city and the grantee company, and the provisions as to the investment of the funds are valid.

It is next contended that the provisions of section 21 for the cancellation of securities of the company in the hands of the trustee upon the order or direction of the city council constitute a donation to the company, in violation of the second of the separate sections of the constitution. An examination of the ordinance does not disclose that there is any element of a donation within the meaning of the constitutional provision. The purpose of the ordinance provision is to provide an effective method for reduction or amortization of the capital account of the company and for a corresponding reduction of the purchase price at which the city or its permittee may acquire the properties of the company. This involves a reduction of the purchase price to be paid by the city rather than a donation of any moneys to the company. The city has an option to buy valuable properties at a definite price. An option to buy property is a valuable contract right. The moment that securities of the company in the city transit fund are canceled the city acquires a new valuable contract right— the right to purchase valuable properties at a correspondingly reduced price, which is a thing of value to the city

or those to whom it may sell. This is not a donation but is an exchange of one thing of value for another. (*City of Chicago* v. *Pittsburg, Cincinnati, Chicago and St. Louis Railway Co.* 244 Ill. 220.) The city is not required to cancel any securities in the transit fund, and whether or not it ever does so depends entirely upon the discretion and future wisdom of the city council. In case it exercises its right in that regard its action would only amount to the cancellation of a present debt for a future benefit. This is not a donation.

It is also contended that the scheme of regulation and supervision of the transit system of the grantee company by the transit commission as provided by the ordinance is invalid because the Transit Commission act is invalid, and also because some of the duties imposed upon the transit commission by the ordinance cannot legally be performed either under the Transit Commission act or under the Public Utilities act. For the reasons above stated it is unnecessary at this time to consider the validity of the Transit Commission act of 1929. Section 19 of the ordinance provides, in effect, that if in any fiscal year the company's earnings shall exceed a just and reasonable return, the amount of the excess shall be paid into the city transit trust fund as additional compensation. It also provides that for the purpose of determining whether there is such an excess, the transit commission, as defined in the ordinance, shall determine by its order what is a just and reasonable return, or if it has no such statutory power, then the just and reasonable return is to be fixed by the members of the commission "acting as a tribunal." The provisions of section 1 of the Terminable Permit act which have been quoted *supra* are ample to warrant inclusion of such terms in an ordinance granting a terminable permit. The Public Utilities act confers upon the Illinois Commerce Commission plenary power with respect to the supervision and regulation of public utilities, including the power to fix reasonable rates and charges for their services. The Com-

merce Commission by this act is given general supervision over public utilties, and is expressly authorized to examine and keep informed "with respect to their compliance with the provisions of this act and any other law, with the orders of the commission and with the charter and franchise requirements." The commission is also authorized to make rules and regulations concerning the conditions to be contained in contracts for public utility services and all services concerning the same. (Cahill's Stat. 1931, chap. 111a, pars. 23, 68.) These and other provisions of the Public Utilities act which are general in their scope are ample to permit the Commerce Commission to determine the matters relating to the operations of the grantee company which are specified in the ordinance.

Section 18 of the ordinance is claimed to be invalid on the ground that it fixes the valuation of the properties of the grantee company, and that the city has thus bargained away its future right to insist upon a lower valuation of the properties. The initial capital value of the company's properties as provided in the ordinance is only tentatively fixed and is made subject to the approval of the Illinois Commerce Commission prior to acceptance of the ordinance by the grantee. Increases in the valuation by reason of additions to the company's properties are also made subject to the approval of the commission. It is therefore the value of the properties as approved by the commission which the ordinance provides shall be used as the basis for fixing the rates of fare and the return to the company. The ordinance does not attempt to, and could not, limit the power of the State to regulate the rates or service of the company. Nor does the ordinance preclude the city from exercising on its own behalf or on behalf of its inhabitants any power or right granted to it by the Public Utilities act.

Other provisions of the ordinance are also attacked, but they do not require separate consideration. The ordinance is not invalid upon any of the grounds urged against it.

Nor is the use of the city traction fund to pay for the subway designated as State street subway route No. 1 illegal.

A further point is made that if the plan embodied in the ordinance be sustained it is of such an arbitrary and unreasonable character as to violate the fourteenth amendment to the Federal constitution. The argument under this point consists largely of a summary of the various points urged against the validity of the legislation of 1929 and the ordinance, and no sufficient basis is presented to sustain the claim of a violation of the due process clause of the Federal constitution.

In our judgment the four acts of 1929 and the ordinance of 1930 above described violate no provisions of the fundamental law of this State or of the United States and are valid legislation. The respective judgment and decree appealed from will therefore be affirmed.

*Judgment and decree affirmed.*

Mr. JUSTICE DUNN, dissenting.